# MUSA-OBREGON LAW, P.C.

## ATTORNEYS AND COUNSELORS AT LAW

SHAUKY MICHAEL MUSA-OBREGON, ESQ.
SAVERIO LO MONACO, ESQ.
PETER KAPITONOV, ESQ. * admitted in NY/NJ
MAYRA VELEZ, ESQ.
RICHARD B. SUTIN, ESQ.
KARL J. ASHANTI, ESQ.
WWW.MUSA-OBREGON.COM
MOLAWFIRM@GMAIL.COM

**\*REPLY TO MASPETH OFFICE**

| **MASPETH OFFICE\*** | **MANHATTAN OFFICE** | **WHITE PLAINS OFFICE** |
|---|---|---|
| 55-21 69TH ST., 2nd FL | 757 THIRD AVE., 20TH FL | 199 MAIN ST., SUITE 301 |
| MASPETH, N.Y. 11378 | NEW YORK, N.Y. 10017 | WHITE PLAINS, N.Y. 10601 |
| TEL (718) 803-1000 | TEL (212) 655-4424 | TEL (914) 380-1436 |
| FAX (718) 374-6576 | FAX (718) 374-6576 | FAX (718) 374-6576 |

August 10, 2023

**BY ECF**
Hon. Robert M. Levy, U.S.DM.J.
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re: *Jane Doe v. New York City Department of Education et al.*, 21 CV 4332 (FB)(RML)

Your Honor:

Our office represents Plaintiff Jane Doe in the above-referenced matter. On behalf of Plaintiff, I submit this letter to respectfully request that the Court unseal all of the contents of the City's motion to withdraw ("Withdrawal Motion") legal representation from Defendant Mark Waltzer and NYC DOE's respective motion papers ("Withdrawal Motion Papers") submitted in opposition thereto. *See* ECF Document Nos. 49 through 57. Alternatively, Plaintiff requests that the Court unseal any and all affidavits or other sworn statements of Defendant Mark Waltzer submitted in opposition to the Withdrawal Motion.

## FACTUAL BACKGROUND

Plaintiff relies on the allegations as set forth in the Second Amended Complaint ("SAC") and incorporates them by reference as necessary herein. As brief summary is as follows: Plaintiff Jane Doe suffered gender-based discrimination over a three-year period of adolescence while attending New York City public schools operated by Defendant NYC DOE. Specifically, during the 1998-1999 school year ("SY"), while Plaintiff was attending the Rachel Carson Intermediate School ("IS-237"), Defendant John Doe #1, an NYC DOE school custodian, sexually harassed Plaintiff by pretending to give her a ride in his car to school and, instead, taking her to a motel without her knowledge or consent where he attempted to have sex with her. That harassment and

abuse of trust led to Plaintiff being physically assaulted on school grounds by a jealous classmate, while NYC DOE teachers and other NYC DOE personnel observed without intervening to end the assault or render aid to Plaintiff following the assault.

During the 1999-2000 SY, while Plaintiff was attending Francis Lewis High School, Plaintiff was groomed for sexual assault by Defendant Mark Waltzer, an NYC DOE teacher and Plaintiff's Social Studies teacher at the time. Waltzer befriended Plaintiff to gain her trust. After Defendant Waltzer gained Plaintiff's trust, he lured Plaintiff to his private apartment and had sexual intercourse with Plaintiff, who was, at the time, fifteen (15) years of age and legally unable to consent to sexual activity of any kind with an adult. Defendant Waltzer continued this unlawful and unethical sexual relationship with Plaintiff, ultimately impregnating her and coercing her to have an abortion.

During the 2000-2001 SY, Plaintiff reported the sexual assault she had suffered from her relationship with Defendant Waltzer to Defendant Douglas Meiners, then a NYC DOE school teacher. Rather than report the sexual abuse that was occurring, Defendant Meiners instead preyed upon Plaintiff's vulnerability by sexually harassing her _himself_. Plaintiff reported Defendant Meiners' sexual harassment of her to Defendant Eisenberg, another NYC DOE school teacher, who then _also_ began to sexually harass Plaintiff. During the same school year, Defendant John Doe #2 separately made unwanted sexual advances towards Plaintiff.

In sum, Defendant John Doe # 1's sexual harassment of Plaintiff, the repeated statutory rape of the Plaintiff by Defendant Waltzer, for which he is liable, the failure by Defendant Meiners to report that sexual abuse, Defendant Meiners' sexual harassment of Plaintiff, Defendant Eisenberg's failure to report that sexual harassment and the sexual harassment by Defendant Eisenberg and John Doe #2 created a pervasive atmosphere of sexual predators all around Plaintiff, caused Plaintiff's grades to tank and forced her to drop out of Francis Lewis High School. That predatory atmosphere, for which the NYC DOE is liable, violated Plaintiff's rights under both the New York State and New York City human rights laws. Further, these traumatic events have caused permanent psychological and emotional injuries to the Plaintiff. *See* SAC, ¶¶1-12.

## LEGAL BASIS FOR UNSEALING THE WITHDRAWAL MOTION PAPERS

Nearly three decades ago, the Second Circuit adopted an established legal doctrine to hold accountable those who would attempt to defraud the Court, the crime-fraud exception. *See United States v. Richard Roe, Inc.*, 68 F.3d 38 (2d Cir. 1995). In <u>Roe</u>, the Court held that "it is well-established that communications that otherwise would be protected by the attorney-client privilege or the attorney work product privilege are not protected if they relate to client communications in furtherance of contemplated or ongoing criminal or fraudulent conduct." 68 F.3d at 40 (quoting *In re Grand Jury Subpoena Duces Tecum*, 731 F.2d 1032, 1038 (2d Cir. 1984)) (citations omitted). In setting this precedent and creating a legal pathway to prevent or rectify fraud or attempted fraud, the Court was protecting the integrity of the judicial process. To afford protection to those who have allegedly engaged in fraudulent and/or criminal conduct, the Court established the legal standard that "a party seeking to invoke the crime-fraud exception must at least demonstrate that there is probable cause to believe that a crime or fraud has been attempted or committed and that the communications were in furtherance thereof." *Id.*

Further, as the Second Circuit opined, "Although there is a societal interest in enabling clients to get sound legal advice, there is no such interest when the communications or advice are intended to further the commission of a crime or fraud." *Id.*; *see also United States v. Rivera*, 837 F.Supp. 565, 569 (S.D.N.Y. Nov. 15, 1993) (finding crime-fraud exception applicable and concluding that disputed files "are not protected by the attorney-client privilege and should be unsealed."); *accord, United States v. Levin*, 2015 U.S. Dist. LEXIS 137615, *14 (S.D.N.Y. Oct. 15, 2015) (finding crime-fraud exception applicable and ordering *in camera* review); *Maitland v. City of New York*, 2014 U.S. Dist. LEXIS 7816, *3 (E.D.N.Y. Jan. 22, 2014) ("Thus, at least to the extent that a plaintiff makes a plausible claim, with specificity, concerning the perjured testimony he or she alleges to have produced the indictment, a substantial need for unsealing the minutes has been established.").[1] The <u>Maitland</u> decision is instructive here.

In <u>Maitland</u>, the plaintiff was prosecuted and subsequently acquitted of driving while intoxicated. His successful defense turned on the testimony of a neighbor at trial that the plaintiff had not been driving his car at the time the police encountered him. Thus, when prosecuting a civil claim of malicious prosecution following his acquittal, the plaintiff contended that any grand jury testimony by a police officer that the officer witnessed the plaintiff driving his car at the time of the encounter would necessarily have been "false and potentially perjurious." *See Maitland, supra*, 2014 U.S. Dist. LEXIS 7816, at *3. Having conducted an *in camera* review of the grand jury testimony, the Court unsealed the grand jury minutes, finding that "the plaintiff has established a sufficient compelling and particularized need for the disclosure of the testimony..." *Id.*

Similarly, here, Plaintiff Jane Doe has a compelling and particularized need for the disclosure of the Withdrawal Motion Papers. The Court has sealed the Withdrawal Motion Papers, which defendants Waltzer and the New York City Law Department ("Law Dept") filed and served under seal with the Court, presumably to shield sensitive and confidential information from being publicly viewed. However, whatever interests led the Court to confer that confidential designation are far outweighed by the strong likelihood that, unless Withdrawal Motion Papers are <u>unsealed</u> – or at least disclosed to Plaintiff, defendant Waltzer may perpetrate a fraud on the Court with impunity. In the process, Waltzer would unfairly prejudice Plaintiff and deceive jurors at the trial, which is scheduled to commence on Monday, October 2, 2023. Waltzer's use of any false statement that exists within the Withdrawal Motion Papers, including any sworn affidavit, is precisely the kind of deceptive and/or criminal conduct the crime-fraud exception was intended to deter, preclude and/or punish. *See, e.g., Roe, supra*, 68 F.3d at 40.

In <u>Roe</u>, the Court held that information that would otherwise be protected from disclosure is not protected and must be disclosed if there is probable to conclude such information is evidence of fraudulent or criminal conduct and was disseminated in furtherance of such criminal or fraudulent conduct. *Id.* Here, although Plaintiff has not yet been privy to the Withdrawal Motion Papers, Plaintiff reasonably surmises that Waltzer has perjured himself, or at least has submitted a false statement to the Court, by means of a sworn affidavit, disseminating the lie that he never had sex with Plaintiff while she was in high school. There is probable cause to conclude so, and that Waltzer provided such a false statement to the Court in furtherance of his fraudulent effort to

---

[1] Copies of the <u>Levin</u> and <u>Maitland</u> decisions are annexed hereto for the convenience of the Court.

deceive the Court and retain the Law Department as his counsel, because of the *contradictions in Waltzer's prior statements*. *See, e.g., Renner v. Chase Manhattan Bank*, 2001 U.S. Dist. LEXIS 17920, *35 (S.D.N.Y. Nov. 1, 2001) (finding that the legal standard of probable cause "in this context means a factual basis sufficient to 'strike a prudent person as constituting a reasonable basis to suspect the perpetration or attempted perpetration of a crime or fraud, and that the communications were in furtherance thereof.'") (quoting *United States v. Jacobs*, 117 F.3d 82, 87 (2d Cir. 1997)) (citations and internal quotation marks omitted).[2]

In Waltzer's *Pro Se* Answer (hereinafter, "*Pro Se* Answer"), filed with the Court on September 16, 2021 (ECF Document 13), to Plaintiff's First Amended Complaint (hereinafter, "FAC"), filed with the Court on August 24, 2021 (ECF Document 9), Waltzer repeatedly denies the allegation that he had sex with Plaintiff. *See Pro Se* Answer, ¶¶4, 55 and 57; FAC, ¶¶4, 55 and 57. Similarly, Waltzer also denied that he got Plaintiff pregnant and coerced her into an abortion. *See Pro Se* Answer, ¶¶58 - 61; FAC, ¶¶58 - 61. Additionally, after the Law Department took up Waltzer's legal representation, months before seeking to withdraw as counsel, his then-counsel, Law Department attorney Sharon Sprayregen, reiterated Waltzer's position that he never had sex with Plaintiff and did not coerce Plaintiff into or pay for any abortion she may have had.

However, in a stunning about-face, Waltzer admitted having an ongoing sexual relationship with Plaintiff in both his Answer to the Second Amended Complaint (hereinafter, "Waltzer's Operative Answer"), filed with the Court on May 8, 2023 (ECF Document 81), and his Responses to Plaintiff's First Interrogatories and Request for Documents (hereinafter, "Waltzer's Discovery Responses"), dated July 14, 2023, a true copy of which is annexed hereto as Exhibit A. *See* Waltzer's Operative Answer, ¶¶4 and 54; Waltzer's Discovery Responses, Response to Interrogatory No. 3. Waltzer further contradicted his Pro Se Answer and the legal defense he had previously set forth in Waltzer's Operative Answer by admitting that he "admits that there were times he had unprotected sex with Plaintiff and that she became pregnant…[that] Plaintiff agreed to have an abortion…[and that] Plaintiff had an abortion…" Waltzer's Operative Answer, ¶¶57 - 59.

In essence, Waltzer's newly concocted defense is that he did have sex with Plaintiff while she was a teenager but that their sexual relationship was lawful because, according to him, Plaintiff was seventeen (17) the first time they had sex.[3] For its part, the Law Dept likely has information and/or documents, submitted to the Court by means of the Withdrawal Motion Papers, which constitute probative evidence tending to show that there was, in fact, a sexual relationship between the two while Plaintiff was in high school and before Plaintiff turned seventeen (17) years of age – despite Waltzer's original denial.

Thus, Waltzer has created the perfect recipe for perpetrating a fraud on the court: couching a false, sworn statement inside confidential motion practice for personal benefit, hidden from the view of the public and Plaintiff, and then using a brand new defense for trial – one that <u>directly</u> contradicts the prior false statement, all while preventing the disclosure of the incriminating evidence the Law Dept possesses and used to extricate itself from his legal representation. Because

---

[2] A copy of the <u>Renner</u> decision is annexed hereto for the convenience of the Court.
[3] Seventeen (17) was and has continually remained the legal age of consent in the State of New York during the years most at issue in this litigation (1998-2002). *See* New York Penal Law § 130.05(3)(a).

of the likelihood of perjury and fraud on the court, as set forth above, the crime-fraud exception applies here and should be employed rectify any perjury or fraud on the court that has already occurred and to preclude any additional perjury or fraud from occurring. *Id.*; *see also Rivera, supra*, 837 F.Supp. at 569; *Levin, supra*, 2015 U.S. Dist. LEXIS 137615 at *14; *Maitland, supra*, 2014 U.S. Dist. LEXIS 7816 at *3.

Finally, it must be noted that defendant Waltzer's deposition is scheduled for Thursday, August 24th. As such, Plaintiff needs to obtain all of the Withdrawal Motion Papers, especially any sworn statement he made, at least a day or two prior to the deposition, in order to fully prepare for it. If Plaintiff does not receive the Withdrawal Motion Papers in advance of Waltzer's deposition, Plaintiff will be greatly and unfairly prejudiced – yet another basis for unsealing and disclosure in similar circumstances. *See Renner, supra*, 2001 U.S. Dist. LEXIS 17920 at *58 (finding the crime-fraud exception applicable and discussing how fraudulent conduct prejudiced plaintiff).

For these reasons, Plaintiff respectfully requests that the Court unseal all of the Withdrawal Motion Papers. Alternatively, Plaintiff requests that the Court unseal for production any and all affidavits or other sworn statements of Defendant Mark Waltzer submitted in opposition to the Withdrawal Motion.

Plaintiff thanks the Court for its time and consideration.

Sincerely,

Karl J. Ashanti, Esq.
Musa-Obregon Law, P.C.

cc:   Andrew Stoll, Esq. (by ECF)
      Jacqueline Dainow, Esq. (by ECF)

Ⓐ Neutral

As of: August 4, 2023 6:18 PM Z

## *United States v. Levin*

United States District Court for the Southern District of New York

October 5, 2015, Decided; October 5, 2015, Filed

15 Cr. 101 (KBF)

**Reporter**

2015 U.S. Dist. LEXIS 137615 *; 2015 WL 5838579

UNITED STATES OF AMERICA -v- KENNETH LEVIN, TAYLOR LEVIN, SEARS HOBBS a/k/a "Karen White," a/k/a "Kelly Chase," JAMES CONLEY, MARCEL HARRIS, STEPHEN FRIEDMAN, and JONATHAN CAMPBELL, Defendants.

**Prior History:** *United States v. Levin, 2015 U.S. Dist. LEXIS 127713 (S.D.N.Y., Sept. 23, 2015)*

## Core Terms

documents, Indictment, crime-*fraud*, attorney-client, defendants', communications, probable cause, in camera, entities, disclosures, search warrant, perpetration, reasonable basis, business entity, privilege log, name change, alleges, ethical, seized, team

**Counsel:** [*1] For Kenneth Levin, Defendant: Juliane Balliro, Nelson Mullins Riley & Scarborough, Boston, CA.

For Taylor Levin, Defendant: Joseph J Balliro, Sr, Balliro Law Office, Tumacacori, AZ; Juliane Balliro, Nelson Mullins Riley & Scarborough, Boston, CA.

For Sears Hobbs, also known as Karen White, also known as Kelly Chase, Defendant: James Kousouros, LEAD ATTORNEY, Law Off. James Kousouros (NY), New York, NY; Robert John Aiello, LEAD ATTORNEY, Aiello & Cannick, Maspeth, NY.

For James Conley, Defendant: Royce Russell,

LEAD ATTORNEY, Emdin & Russell, LLP, New York, NY.

For Marcel Harris, Defendant: Stephanie M. Carvlin, LEAD ATTORNEY, Law office of Stephanie Carvlin, New York, NY.

For Stephen Friedman, Defendant: Glenn H. Ripa, Follick & Bessich, Huntington Station, ny.

For Jonathan Campbell, Defendant: Anthony Strazza, Law Office of Anthony Strazza, White Plains, NY.

For USA, Plaintiff: Janis Echenberg, LEAD ATTORNEY, U.S. Attorney's Office, SDNY (St Andw's), New York, NY; Kimberly Jane Ravener, LEAD ATTORNEY, U.S. Attorney's Office- Southern District of New York, New York, NY; Jennifer L. Beidel, United States Attorney's Office, SDNY, New York, NY.

**Judges:** KATHERINE B. FORREST, United States District Judge. [*2]

**Opinion by:** KATHERINE B. FORREST

## Opinion

OPINION & ORDER

KATHERINE B. FORREST, District Judge:

Pending before the Court is the Government's motion for an order finding that the ***crime-fraud exception*** applies to certain categories

of documents and communications that defendant Kenneth Levin claims are protected by the attorney-client privilege. (ECF No. 90.) Levin claims these materials are privileged because they are based on his attorney-client relationships with the law firm of Wagner, Johnston & Rosenthal, P.C. ("Wagner"), and that the Government has failed to meet its burden of showing that the **crime-fraud exception** should vitiate that privilege.

As set forth below, the Government has made the necessary showing to support the existence of probable cause to believe that a criminal **fraud** has been committed and that the communications at issue were made in furtherance of that crime. However, the Court will not require immediate production to the Government, but instead will exercise its discretion to undertake an in camera review.

## I. BACKGROUND

On or about February 23, 2015, a grand jury sitting in this District returned a three-count Indictment charging that from approximately 2005 through 2011, Levin and several [*3] co-conspirators conspired to commit mail and wire **fraud**, and in fact committed mail and wire **fraud**, by orchestrating a scheme to sell vending machine "business opportunities" to prospective customers. (Indictment, ECF No. 2.) The Indictment alleges that in furtherance of that scheme, Levin and the other defendants operated out of at least six different corporate entities over a period of seven years. The Indictment alleges further that these name changes were done for the purpose of evading a federal law that required a disclosure statement including a list of past customers to be sent to prospective vending machine "business opportunity" customers.[1]

(Indictment ¶ 22.a.). The Government proffers that the evidence shows that the six successive corporate entities shared the same address and phone number. (Gov. Br. 7, ECF No. 90.) Levin does not dispute that during the period encompassed by the Indictment, he retained counsel to perform various legal services, including, inter alia, the formation of new entities at the end of the prior entity's fiscal year, through which he sold business opportunities. (Levin Br. 2.)

In April 2011, Magistrate Judge Theodore H. Katz authorized a search warrant for certain premises then doing business under the name United Marketing Associates Corporation ("United Marketing"). (ECF No. 83-2.) Pursuant to the search warrant, documents were seized from United Marketing's offices and computers.[2] (Gov. Br. 2-3.)[3] The Government created a taint team to review the documents seized in the search and to identify and isolate any arguably privileged documents. (Gov. Br. 3.) After the defendants were subsequently indicted, the Government produced the arguably privileged documents to defense counsel on April 10, 2015. (Gov. Br. 3.) On May 7, 2015, the Court directed the defendants to assert any privilege claims over the documents by May 21, 2015. (ECF No. 60.) Levin's counsel timely provided a privilege log on behalf of Levin and his son, defendant Taylor Levin.[4] (Gov. Br. [*5] 3.)

---

[1] The disclosure requirements referenced in the Indictment are stated in [*4] the Federal Trade Commission's ("FTC") Business Opportunity Rule (the "Rule"). See 16 CFR part 437. The versions of the Rule in effect during the period relevant to

the Indictment did not prohibit the creation of new entities to carry on the same business under the same leadership as prior business opportunity seller entities.

[2] In an Opinion & Order dated September 23, 2015, the Court denied defendants' motion to suppress the evidence seized pursuant to the April 2011 search warrant. (ECF No. 124.)

[3] Levin does not dispute the Government's recitation of the procedures it employed to review the seized documents, including the documents over which Levin asserts the privilege.

[4] Counsel for defendants James Conley and Sears Hobbs joined in the log; counsel for Hobbs also submitted a supplemental set of documents to add to the log. (Gov. Br. 3.)

The defendants' privilege logs and all potentially privileged documents were produced to an Assistant U.S. Attorney (the "Wall AUSA"), who is not a member of the prosecution team in this case. The Wall AUSA raised several issues regarding defendants' assertions of privilege to defendants' counsel, who indicated that they objected to making the documents at issue available to the Government's case team. (Gov. Br. 3.) The Government's motion to apply the *crime-fraud exception*, which was prepared and brought by the Wall AUSA, rather than by the Government's prosecution team for this case, followed.

The Court notes that it has concerns regarding the procedures used by the Government [*6] in bringing this motion, and particularly with regard to the role of the Wall AUSA. (The Court does understand that a similar process has been used in this District on other occasions. See *United States v. Ceglia, No. 12-CR-876 VSB, 2015 U.S. Dist. LEXIS 45027, 2015 WL 1499194 (S.D.N.Y. Mar. 30, 2015)*.) The Government's use of an ethical wall to conduct a responsiveness and privilege review of material seized pursuant to a search warrant is rooted in the protections of the *Fourth Amendment*. See *28 C.F.R. § 59.4(b)* (discussing procedures for use of search warrants which may intrude upon professional confidential relationships). In short, when searches capture large volumes of documents, some of which may be privileged or non-responsive, the ethical wall is designed to protect the defendant's rights to the protection of his privilege and the culling out of documents not within the scope of the search warrant. The balance between protecting a defendant's *Fourth Amendment* rights and the realities of how documents are seized has led, *inter alia*, to the practice of using an ethical wall. As the wall is for the protection of the defendant's rights, it is decidedly not to give the Government a substantive look into that which it has no right to see.

The Court believes that the practice of having the Wall AUSA file a [*7] motion for application of the *crime-fraud exception* on behalf of the prosecution team conflicts with the Wall AUSA's intended role to *prevent* overbreadth of the Government's seizure of material pursuant to a search warrant.[5] In the Wall AUSA's circumscribed role, he or she is not supposed to affirmatively act on behalf of the prosecution. Several courts in this district have expressed concern over the very practice of utilizing a Wall AUSA to conduct an initial review of seized material for potential privilege issues in the first instance. See, e.g., *United States v. Kaplan, No. 02 CR. 883(DAB), 2003 U.S. Dist. LEXIS 21825, 2003 WL 22880914, at *12 (S.D.N.Y. Dec. 5, 2003)*; *In re Search Warrant for Law Offices Executed on March 19, 1992, 153 F.R.D. 55, 59 (S.D.N.Y. 1994)*. By bringing the instant motion, the Wall AUSA has gone one step further. What the Court finds particularly problematic in this instance is that the Wall AUSA, at least implicitly, bases her motion on her substantive awareness of the content of the documents at issue. This raises the potential *Fourth Amendment* concerns the ethical wall was intended to avoid.[6]

II. LEGAL STANDARDS

---

[5] The Court notes that one of the recognized and accepted tasks of the Wall AUSA is to make initial privilege determinations of otherwise responsive documents. One could argue that pursuing the *crime-fraud exception* is within the scope [*8] of that task. But such an argument avoids several important realities including (1) the ethical wall is to avoid prejudice to the defendant, and (2) when a Wall AUSA uses the very information seen to make a motion in the Court in which the criminal matter is being prosecuted, that Wall AUSA has stepped into substantive participation in the case.

[6] The Court notes that for some reason the Wall AUSA has retained a set of the documents which are the subject of this motion. (See Gov. Br. 9.) Until the Court orders otherwise, those documents belong to the defendants based on their presumptive privilege.

## A. _Crime-Fraud Exception_

"The attorney-client privilege is not without its costs." _United States v. Zolin, 491 U.S. 554, 562, 109 S. Ct. 2619, 105 L. Ed. 2d 469 (1989)_. Alleged—as well as actual—wrongdoers are entitled to the protections of the privilege. Id. There is no basis in the law to find that a complaint asserting _fraud_ or other wrongdoing automatically vitiates the privilege. If allegations alone could lead to such a result, the attorney-client privilege would be weak indeed. With that said, the law is clear that under the _crime-fraud exception_, when the attorney-client relationship is used as part of the scheme to defraud, that is, when the communications **[*9]** are made for the purpose of, or in furtherance of, the scheme to defraud, the privilege no longer applies. _Id. at 562-63_; see also _In re Richard Roe, Inc., 68 F.3d 38, 40 (2d Cir. 1995)_; _In re Grand Jury Subpoena Duces Tecum Dated Sept. 15, 1983 ("Marc Rich"), 731 F.2d 1032, 1038 (2d Cir. 1984)_ ("It is well-established that communications that otherwise would be protected by the attorney-client privilege or the attorney work product privilege are not protected if they are in furtherance of ongoing criminal or fraudulent conduct."). The _crime-fraud exception_ may apply regardless of the attorney's lack of knowledge that he is being consulted in furtherance of the crime or _fraud_. _Marc Rich, 731 F.2d at 1038_; see _Clark v. United States, 289 U.S. 1, 15, 53 S. Ct. 465, 77 L. Ed. 993 (1933)_. But, communications that are merely relevant to the fraudulent scheme will not trigger the _crime-fraud exception_. See _United States v. Jacobs, 117 F.3d 82, 88 (2d Cir. 1997)_, abrogated on other grounds by _Loughrin v. United States, 134 S. Ct. 2384, 189 L. Ed. 2d 411 (2014)_.

The party withholding documents on the basis of the attorney-client privilege bears the burden of supporting that privilege with sufficient information to indicate its applicability. _See Fed. R. Civ. P. 26(b)(5)_. To overcome that privilege, the party seeking to vitiate the privilege must show probable cause that a crime or _fraud_ has been committed and that the communications were in furtherance thereof. _Marc Rich, 731 F.2d at 1039_; see also _Jacobs, 117 F.3d at 87_.

In _Jacobs_, the Second Circuit held that to support such a **[*10]** showing of probable cause, the movant must put forward a factual basis that would strike a prudent person as "constituting 'a reasonable basis to suspect the perpetration or attempted perpetration of a crime or _fraud_, and that the communications were in furtherance thereof.'" _Jacobs, 117 F.3d at 87_ (quoting _In re John Doe, Inc., 13 F.3d 633, 637 (2d Cir. 1994))_. To order an in camera review of documents for which the attorney-client privilege has been claimed, the Court must find that the Government makes a "showing of a factual basis adequate to support a good faith belief by a reasonable person . . . that in camera review of the materials may reveal evidence to establish the claim that the _crime-fraud exception_ applies." _In re John Doe, Inc., 13 F.3d at 636_ (quoting _Zolin, 491 U.S. 554, 572, 109 S. Ct. 2619, 105 L. Ed. 2d 469 (1989)_ (quotation marks and citation omitted)). Once such a showing has been made, the Court has the discretion to engage in an in camera review. _Jacobs, 117 F.3d at 87_.

## III. DISCUSSION

Here, to support its motion to vitiate the attorney-client privilege, the Government appropriately relies on the allegations of the Indictment, audio recordings that, according to the Government, capture two of the defendants discussing changing the name of the business-opportunity entity to avoid disclosure requirements and one additional defendant stating that defendants' **[*11]** re-register their business entity every year to avoid FTC disclosures, and proffered

testimony of a cooperating witness. (Gov. Br. 7.) The Government also relies on the 7 descriptions of documents from defendants' privilege logs. The Government contends that, taken together, these materials establish sufficient probable cause that a crime or *fraud* was committed and that the attorney-client communications at issue were made with the objective of furthering the crime or *fraud*. The Court agrees.

The Grand Jury has returned an Indictment, finding probable cause to charge the defendants with mail and wire *fraud*. (Indictment, ECF No. 2.) The Government has thus satisfied the first prong of the *crime-fraud exception*. See *Kaley v. United States, 134 S. Ct. 1090, 1097, 188 L. Ed. 2d 46 (2014)*.

As to the second prong, the Indictment does not, by itself, also establish that the attorney-client communications at issue were made in furtherance of defendants' crime. The Court acknowledges that the Indictment alleges that the name changes of defendants' business entities were part of defendants' scheme. (See Indictment ¶ 22.a.). But the issuance of an Indictment does not necessarily equate with agreement by the Grand Jury that there is probable cause to believe each [*12] alleged fact occurred as stated. Nevertheless, there is a sufficient factual basis for this Court to make the necessary determination. Audio recordings in which two defendants discuss changing the name of their business-opportunity entities to avoid disclosure requirements and another defendant states that defendants' re-register their business entity every year to avoid FTC disclosures, combined with the Government's proffered testimony of a cooperating witness that Levin's purpose in changing the name of his corporate entities was to disguise the fraudulent scheme, provide the Court with "a reasonable basis to suspect the perpetration or attempted perpetration of a crime or *fraud*, and that the communications were in

furtherance thereof." *Jacobs, 117 F.3d at 87*. Although the Government does not contend that defendants' routine name changes were in and of themselves violations of any law, that is not dispositive. Facially legitimate conduct may constitute an action taken in furtherance of *fraud* in appropriate circumstances. See *In re John Doe Corp., 675 F.2d 482, 491 (2d Cir. 1982)* (applying *crime-fraud exception* to documents relating to a "Business Ethics Review" report that a corporation used to induce underwriters and auditors involved in a public offering [*13] to believe that no irregularity had been found with respect to prior payments the corporation had made to a lawyer).

Defendants' privilege log entries also provide the Court a reasonable basis to conclude that the contested documents are pertinent to the name changes. For example, the privilege log describes a number of documents as pertaining to FTC and various state law disclosures. (See Gov. Br., Ex. A.) Given the allegation that defendants changed their business entity names to avoid having to make such disclosures, the Court finds a reasonable basis to conclude that these documents relate to defendants' business entity name changes.

Defendants counter that certain portions of the Government's recordings provide an innocent explanation for their routine practice of changing their business-opportunity entity names. But "the fact that an innocent explanation may be consistent with the facts alleged . . . does not negate probable cause." *Panetta v. Crowley, 460 F.3d 388, 395 (2d Cir. 2006)* (alterations and quotation marks omitted)). That argument goes to the weight of the evidence and is insufficient to defeat the existence of probable cause. *Krause v. Bennett, 887 F.2d 362, 372 (2d Cir. 1989)* (probable cause inquiry does not serve to [*14] "finally determine guilt through a weighing of the evidence"). To invoke the

**_crime-fraud exception_**, the Government need only establish a "reasonable basis" to suspect that the communications were in furtherance of the perpetration or attempted perpetration of a crime or **_fraud_**. _Jacobs, 117 F.3d at 87_. It has done so.[7]

While the Court concludes that the Government has made a sufficient showing of probable cause, the Court does not believe that the result is so obvious such that it would be appropriate to order defendants to immediately produce the documents at issue to the Government. Instead, the Court exercises its discretion to order the documents to first be produced to the Court for in camera review. _See Jacobs, 117 F.3d at 87_ ("[T]he decision whether to engage in an in camera review of the evidence lies in the discretion of the district court."); _In re John Doe. Inc., 13 F.3d at 636_ (A Court may order an in camera review if there is a "good faith belief . **[*15]** . . that in camera review of the materials may reveal evidence to establish the claim that the **_crime-fraud exception_** applies."). An in camera review will place the Court in the best position to make an informed decision as to whether invasion of the attorney-client privilege is justified.

## IV. CONCLUSION

For the reasons set forth above, the Court hereby orders the parties to produce to the Court for in camera review, not later than **Tuesday, October 13, 2015**, the documents identified on page 9 of the Government's opening brief in support of its motion.[8]

---

[7] Defendants' intentions are, of course, an issue that must be determined by the finder of fact at trial on a full record. The Court does not in this decision purport to weigh the merits of the Government's case or make any ruling as to the meaning or significance of any evidence anticipated to be offered at trial.

[8] The Court notes the Wall AUSA's request for permission to disclose a complete set of briefing on this motion to the Government's case team. The Court sees no reason, at this

SO ORDERED.

Dated: New York, New York

October 5, 2015

/s/ Katherine B. Forrest

KATHERINE B. FORREST

United States District Judge

---

**End of Document**

---

juncture, for the parties' briefs with respect to the instant motion, or for this decision, to remain under seal. Therefore, the Court will post this Opinion & Order to the docket on the **afternoon of Wednesday, October 7, 2015**, unless it has received an objection from any party **within 48 hours** of receiving a copy of this Opinion & Order. The parties are also hereby ordered to file unredacted copies of their briefs on the public docket by the **end of day on October 7, 2015 [*16]** unless any party objects to **_unsealing_** these materials **within 48 hours** of receiving a copy of this Opinion & Order. Any objecting party should explain the basis for its objection and identify the particular material that it believes should remain sealed.

Additionally, the Court requests that the Wall AUSA notify the Court **within 48 hours** of receiving this decision whether the Government's briefs relating to this motion rely in any way on information that the Wall AUSA obtained from review of the documents at issue. If so, the Wall AUSA shall identify to the Court the portions of the Government's briefs that rely on that knowledge.

No *Shepard's* Signal™
As of: August 4, 2023 5:32 PM Z

### *Maitland v. City of New York*

United States District Court for the Eastern District of New York

January 22, 2014, Decided; January 22, 2014, Filed

CV-13-2807 (WFK)(VVP)

**Reporter**

2014 U.S. Dist. LEXIS 7816 *

LLOYD MAITLAND, Plaintiff, - v - CITY OF NEW YORK, et al., Defendants.

## Core Terms

minutes, grand jury *testimony*, excessive force, allegations, releases, grand jury, disclosure, malicious prosecution claim, disciplinary history, state court, tax return, defendants', indictment, driving, *perjury*, records, *unseal*, motion to compel production, grand jury proceedings, criminal history, in camera, Unemployment, prosecuted, discovery, motions

**Counsel:** [*1] For Lloyd Maitland, Plaintiff: David Bruce Rankin, LEAD ATTORNEY, Rankin & Taylor, New York, NY.

For City of New York, Donald Perceval, New York City Police Department Officer, Shield #1031, Sgt. Sean Downs, Shield #3978, P.O. Robert Ho, Shield #886, in their individual capacities, Defendants: Susan P. Scharfstein, LEAD ATTORNEY, NYC Law Department, New York, NY.

**Judges:** VIKTOR V. POHORELSKY, United States Magistrate Judge.

**Opinion by:** VIKTOR V. POHORELSKY

## Opinion

## MEMORANDUM ORDER

There are three discovery motions now pending in this matter. The plaintiff has made a motion for the disclosure of certain grand jury testimony that may have been given by the defendants, Dkt. Ent. 16, and a motion to compel production of records concerning allegations of the use of excessive force by the defendants, Dkt. Ent. 23. The defendants have moved to compel the plaintiff to provide releases to obtain his criminal history, his unemployment compensation records, and his tax returns. Dkt. Ent. 24. The motions are addressed in turn below.

### *Motion to Disclose Grand Jury Testimony*

The motion for disclosure of grand jury testimony was preceded by an application seeking an order to *unseal* the minutes of the grand jury proceedings which the [*2] plaintiff made to the state court in which the plaintiff was prosecuted. That court determined that the extent and timing of any disclosure of grand jury testimony should be made by this court, following *in camera* inspection. *In re Maitland, No. 2312/2011, 2013 N.Y. Misc. LEXIS 4019 at *8-*9 (N.Y. Sup. Ct. Sep. 5, 2013).* Accordingly, the state court directed that the minutes of the testimony be delivered to this court for such a review, and the Office of the District Attorney, Kings County, has now provided the minutes to me.

In the opinion issued by the state court on the plaintiff's application to *unseal*, the court

2014 U.S. Dist. LEXIS 7816, *2

observed that although the recent Supreme Court decision in _Rehberg v. Paulk, 132 S. Ct. 1497, 182 L. Ed. 2d 593 (2012)_, may preclude the use of grand jury testimony to prove a federal malicious prosecution claim under _section 1983_ against an officer who gave the testimony, it did not preclude use of such testimony to support a malicious prosecution claim under state common law. _In re Maitland, 2013 N.Y. Misc. LEXIS 4019 at *4-*7._ The court went on to point out that, under New York law, to prove a malicious prosecution claim a plaintiff who was indicted "must establish that the indictment was produced by fraud, perjury, the suppression [*3] of evidence or other police conduct undertaken in bad faith." _Colon v. City of New York, 60 N.Y.2d 78, 83, 455 N.E.2d 1248, 468 N.Y.S.2d 453 (1983)._ Proof of **_perjury_** before the grand jury would of course require proof regarding the testimony that was given, the best evidence of which would be the grand jury minutes. Thus, at least to the extent that a plaintiff makes a plausible claim, with specificity, concerning the **_perjured testimony_** he or she alleges to have produced the indictment, a substantial need for **_unsealing_** the minutes has been established. Indeed, in most cases it is unlikely that a plaintiff could prevail on such a claim without the minutes.

The plaintiff here was prosecuted, and ultimately acquitted, of driving while intoxicated with underage children. His defense, supported by testimony from a neighbor who said she witnessed the plaintiff's encounter with the police, was that he had not been driving the automobile when it was stopped by the police. He thus contends that to the extent that any of the officers who arrested him here gave testimony to the grand jury that they saw him driving the automobile, their testimony would have been false and potentially **_perjurious_**.

Having conducted an _in camera_ review [*4] of

the testimony before the grand jury, I find that the plaintiff has established a sufficiently compelling and particularized need for disclosure of the **_testimony_** given by Police Officer Don Perceval at pages 5 through 7 of the minutes of the grand jury proceedings.[1] The testimony shall be considered "**_Confidential_** Material" within the meaning of the Confidentiality Stipulation and Protective Order previously entered by the court. Dkt. Ent. 22.[2]

_Motion to Disclose Disciplinary History Concerning Allegations of Excessive Force_

As the plaintiff has not made a claim for excessive force in this action, other than that his handcuffs were too tight, discovery concerning any disciplinary history related to allegations of excessive force made by others is not [*5] reasonably calculated to lead to evidence admissible at trial. _E.g., Barrett v. City of New York, 237 F.R.D. 39, 40 (E.D.N.Y. 2006)_; _Pacheco v. City of New York, 234 F.R.D. 53, 55 (E.D.N.Y. 2006)_; _Younger v. City of New York, No. 03 CIV. 8985, 2006 U.S. Dist. LEXIS 25879, 2006 WL 1206489, at *1 (S.D.N.Y. May 2, 2006)._ Accordingly, the motion to compel production of disciplinary history concerning allegations of excessive force is denied.

_Motion to Compel Releases for Criminal History, Unemployment Records and Tax Returns_

---

[1] Under New York law, one seeking disclosure of grand jury minutes must demonstrate "a compelling and particularized need for access." _In re Dist. Att'y of Suffolk Cnty., 58 N.Y.2d 436, 444, 448 N.E.2d 440, 461 N.Y.S.2d 773 (1983)_

[2] The court will mail copies of the pages of the minutes of Officer Perceval's testimony to counsel for all the parties upon expiration of the time for filing objections to this ruling or advice from all counsel that objections will not be filed.

The plaintiff, in response to the defendants' motion for various releases, has agreed to provide the requested releases in view of the defendants' withdrawal of the demand for tax returns. The defendants' motion therefore appears to be moot and it is dismissed as such, subject to renewal if issues concerning the releases re-emerge.

**SO ORDERED**:

/s/ *Viktor V. Pohorelsky*

VIKTOR V. POHORELSKY

United States Magistrate Judge

Dated: Brooklyn, New York

January 22, 2014

---

**End of Document**

⚠ Caution
As of: August 10, 2023 6:54 PM Z

# *Renner v. Chase Manhattan Bank*

United States District Court for the Southern District of New York

November 1, 2001, Decided ; November 2, 2001, Filed

98 Civ. 926 (CSH)

**Reporter**
2001 U.S. Dist. LEXIS 17920 *

KLAUS RENNER, Plaintiff -against- CHASE MANHATTAN BANK, MICHELINO MORELLI, TOWNSEND FINANCIAL SERVICES CORP., TOWNSEND INVESTMENT FUND, LLC, GERALD TOWNSEND, and RABON WOLFORD, Defendants.

**Prior History:** *Renner v. Chase Manhattan Bank, 2001 U.S. Dist. LEXIS 17918 (S.D.N.Y. Nov. 1, 2001)*

**Disposition:** Ruling on privileged documents.

## Core Terms

documents, attorney-client, privileged, falls, communications, work-product, characterizes, comprise, copies, funds, handwritten note, in camera, crime-fraud, redacted, attach, fax, conversation, instructions, wire, legal advice, confidences, correspondence, defendants', discovery, recited, circumstances, confidential, distributed, enclosing, probable cause

## Case Summary

### Procedural Posture

Plaintiff investor sought production of a number of documents in a case where defendant investment fund and others allegedly diverted the investor's money to buy a villa in Monaco. Counsel for the fund prepared a privilege log identifying each document claimed to be privileged.

### Overview

The investor made three substantive arguments with respect to the sought-after documents. First, he contended that communications between a fund manager and his attorneys were not privileged if their purpose was to advance the business objectives of the manager or his companies. Second, the investor questioned whether, in any event, the documents in the privilege log fell within either the attorney-client or work-product privilege. Third, the investor contended that even if these documents were covered by the attorney-client privilege, the crime-fraud exception applied to them, so that production was required. The court stated that, with regard to the first two issues, the fund bore the burden of showing that a particular document was privileged. The investor bore the burden of showing the applicability of the crime-fraud exception. Primarily, the court noted that the fund's claims of privilege were frequently too broad, and therefore, applied principles limiting the privileges. In the final portion of the opinion, the court found that the investor satisfied the two-pronged showing necessary for application of the crime-fraud exception as to one document.

### Outcome

The court held that a number of documents were not privileged, that certain documents were privileged in part, and that other documents were privileged. One document had to be produced pursuant to the crime-

2001 U.S. Dist. LEXIS 17920, *17920

fraud exception. Decision was reserved as to the privileged status of certain documents.

## LexisNexis® Headnotes

Civil
Procedure > ... > Discovery > Privileged Communications > General Overview

*HN1*[⤓]          Discovery,          Privileged Communications

A party asserting privilege has the burden of showing that communications to and from its attorney were made solely for the purpose of the party seeking legal advice and its counsel rendering it, and not for the purpose of advancing a party's business ventures.

Civil Procedure > ... > Privileged Communications > Work Product Doctrine > General Overview

Evidence > Privileges > Attorney-Client Privilege > General Overview

Civil
Procedure > ... > Discovery > Privileged Communications > General Overview

*HN2*[⤓]  Privileged Communications, Work Product Doctrine

A party claiming attorney-client or work-product privilege bears the burden of showing that a particular document is privileged.

Civil
Procedure > ... > Discovery > Privileged Communications > General Overview

*HN3*[⤓]          Discovery,          Privileged Communications

A party seeking production bears the burden of showing the applicability of the crime-fraud exception.

Civil Procedure > ... > Privileged Communications > Work Product Doctrine > General Overview

Evidence > Privileges > Attorney-Client Privilege > Scope

Legal Ethics > Client Relations > Duties to Client > Duty of Confidentiality

Civil
Procedure > ... > Discovery > Privileged Communications > General Overview

Evidence > Privileges > Attorney-Client Privilege > General Overview

*HN4*[⤓]  Privileged Communications, Work Product Doctrine

The practical consequence of the attorney-client privilege is that there can be neither compelled nor voluntary disclosure by the attorney of matters conveyed to the attorney in confidence by a client for the purpose of seeking legal advice.

Civil
Procedure > ... > Discovery > Privileged Communications > General Overview

Evidence > Privileges > Attorney-Client Privilege > General Overview

Civil Procedure > Discovery & Disclosure > General Overview

Civil Procedure > ... > Discovery > Methods

2001 U.S. Dist. LEXIS 17920, *17920

of Discovery > Inspection & Production Requests

Legal Ethics > Client Relations > Duties to Client > Duty of Confidentiality

## HN5[⚖] Discovery, Privileged Communications

The attorney-client privilege tends, in most instances, to be a two-way street, protecting from compelled disclosure what is said or written to or by an attorney to the client for the purpose of seeking legal counsel. It follows that not all documentary references to attorney-client communications or that relationship fall within the privilege. Thus, the date on which a privileged communication took place and the identity of the persons who participated in a meeting or, in the case of a document, the persons who received copies of it, are not generally regarded as privileged. Similarly, federal courts uniformly allow the identity of the client and matters regarding fee arrangements to be discovered, except in the very limited circumstances when that discovery would actually reach client confidences; it generally follows that the billing statements that attorneys submit to clients are equally discoverable. If production of such documents will necessarily reveal client confidences, then redactions will be ordered to protect the privileged material while allowing discovery of the nonprivileged material.

Civil Procedure > ... > Discovery > Privileged Communications > General Overview

Evidence > Privileges > Attorney-Client Privilege > Elements

## HN6[⚖] Discovery, Privileged Communications

The attorney-client privilege does not extend to

the general nature of the legal services the attorney was retained to perform or to the terms and conditions of the attorney's engagement.

Civil Procedure > ... > Privileged Communications > Work Product Doctrine > Fact Work Product

Civil Procedure > Attorneys > General Overview

Civil Procedure > ... > Discovery > Methods of Discovery > General Overview

Civil Procedure > ... > Discovery > Privileged Communications > General Overview

Civil Procedure > ... > Privileged Communications > Work Product Doctrine > General Overview

Civil Procedure > ... > Privileged Communications > Work Product Doctrine > Opinion Work Product

## HN7[⚖] Work Product Doctrine, Fact Work Product

An attorney's work-product protection, which under *Fed. R. Civ. P. 26(b)(3)* comes into play only if the documents in question are otherwise discoverable, is divided into two categories: "opinion" work product which reflects or reveals the attorney's mental processes, which the courts invariably protect; and "ordinary" work product, which is subject to discovery upon a showing of need and hardship. In either event, however, following the wording of the rule, the work-product privilege that has developed consequently applies not to all materials in an attorney's files, but only to those materials that were prepared in anticipation of litigation or for trial. Thus there is no work-product protection for

documents prepared in the regular course of business rather than for purposes of the litigation; so too, documents prepared for other purposes do not become protected as work product by being examined in anticipation of litigation.

Civil Procedure > ... > Discovery > Privileged Communications > General Overview

Evidence > Privileges > Attorney-Client Privilege > General Overview

## HN8[🖾] Discovery, Privileged Communications

The attorney-client privilege need not be limited to legal consultations between corporations in litigation situations. Corporations should be encouraged to seek legal advice in planning their affairs to avoid litigation as well as in pursuing it.

Civil Procedure > ... > Discovery > Privileged Communications > General Overview

Evidence > Privileges > Attorney-Client Privilege > Scope

Legal Ethics > Client Relations > Duties to Client > Duty of Confidentiality

Evidence > Privileges > Attorney-Client Privilege > General Overview

## HN9[🖾] Discovery, Privileged Communications

It is important to bear in mind that the attorney-client privilege protects communications rather than information; the privilege does not impede disclosure of information except to the extent that that disclosure would reveal confidential communications.

Civil Procedure > ... > Discovery > Privileged Communications > General Overview

## HN10[🖾] Discovery, Privileged Communications

Clients and their attorneys often assume, erroneously, that merely conveying something to an attorney will cloak the underlying facts from disclosure. It will not.

Civil Procedure > ... > Discovery > Privileged Communications > General Overview

Civil Procedure > Discovery & Disclosure > Discovery > Relevance of Discoverable Information

## HN11[🖾] Discovery, Privileged Communications

Legal departments are not citadels in which public, business or technical information may be placed to defeat discovery and thereby ensure confidentiality.

Civil Procedure > ... > Discovery > Privileged Communications > General Overview

Evidence > Privileges > Attorney-Client Privilege > Scope

Evidence > Privileges > Attorney-Client Privilege > General Overview

## HN12[🖾] Discovery, Privileged Communications

The fact that the document is to be sent to a

2001 U.S. Dist. LEXIS 17920, *17920

third party ordinarily removes the cloak of confidentiality necessary for protection under the attorney-client privilege. Drafts of documents may be considered privileged if they were prepared for the purpose of obtaining legal advice and/or contain information a client considered but decided not to include in the final version; the privilege may also attach if the party asserting it shows that a confidential communication was eliminated from the final document. The party opposing production has the burden it is to sustain the privilege.

Civil Procedure > ... > Discovery > Privileged Communications > General Overview

*HN13*[🔒]     **Discovery, Privileged Communications**

Application of the crime-fraud exception requires a two-pronged showing. A party wishing to invoke the crime-fraud exception must demonstrate that there is a factual basis for a showing of probable cause to believe that a fraud or crime has been committed and that the communications in question were in furtherance of contemplated or ongoing criminal or fraudulent conduct. Probable cause in this context means a factual basis sufficient to strike a prudent person as constituting a reasonable basis to suspect the perpetration or attempted perpetration of a crime or fraud, and that the communications were in furtherance thereof. With respect to the second necessary showing, that a particular document is in furtherance of a crime or fraud, the United States Court of Appeals for the Second Circuit has rejected a "relevant evidence" test, that is to say, an inquiry limited to whether the material sought might provide evidence of a crime or fraud. Instead, it imposes the more stringent requirement that there be (1) a determination that the client

communication was itself in furtherance of the crime or fraud, and (2) probable cause to believe that the particular communication with counsel or attorney work product was intended in some way to facilitate or conceal the criminal activity.

Criminal Law & Procedure > Accessories > Aiding & Abetting

Torts > Business Torts > Fraud & Misrepresentation > General Overview

*HN14*[🔒]  **Accessories, Aiding & Abetting**

The elements of a claim of aiding and abetting fraud are the existence of a fraud, the defendant's knowledge of the fraud, and the defendant's substantial assistance to advance the fraud.

**Counsel:** [*1]  For KLAUS RENNER, plaintiff: Robert L. Herbst, Herbst & Greenwald LLP, New York, NY.

For TOWNSEND FINANCIAL SERVICES CORP., TOWNSEND INVESTMENT FUND, LLC, GERALD TOWNSEND, defendants: Richard J. DeMarco, Jr., Reed, Smith, Shaw & McClay, L.L.P., Scott Stephen McKessy, Reed, Smith, Shaw & McKlay, L.L.P., Scott S. McKessy, Reed Smith LLP, New York, NY.

**Judges:** CHARLES S. HAIGHT, JR., SENIOR UNITED STATES DISTRICT JUDGE.

**Opinion by:** CHARLES S. HAIGHTJR.

## Opinion

*MEMORANDUM OPINION AND ORDER*

*HAIGHT, Senior District Judge:*

During the course of pre-trial discovery,

2001 U.S. Dist. LEXIS 17920, *1

counsel for the Townsend defendants have asserted claims of attorney-client privilege and attorney's work-product privilege with respect to a number of documents. [1] As directed by the Court in _Renner III, 2001 U.S. Dist. LEXIS 4634, 2001 WL 388044_ at *3, counsel for defendants prepared a Privilege Log identifying each document claimed to be privileged and the particular privilege or privileges asserted with respect to them. The documents were also given "Bates Numbers" falling within a series beginning with the designation "GTDC-00." For the sake of brevity, I will omit the initials in discussing the particular documents, contenting myself [*2] with the numbers.

Plaintiff makes three substantive arguments with respect to these documents. [2] First, he contends that communications between Gerald Townsend and his attorneys (principally Donald Clark) are not privileged if their purpose was to advance the business objectives of Townsend or his companies. As I observed in _Renner III, 2001 U.S. Dist. LEXIS 4634, 2001 WL 388044_ at *1, the Townsend HN1[↑] defendants "have the burden of showing that communications to and from Clark were made solely for the purpose of the defendants seeking legal advice and its counsel rendering it, and not for the purpose of

advancing a party's [*3] business ventures" (citations and internal quotation marks omitted).

Second, plaintiff questions whether, in any event, the documents defendants list in their Privilege Log fall within either privilege.

Third, plaintiff contends that even if these documents were covered by the attorney-client privilege, the crime-fraud exception applies to them, so that production to plaintiff must be made.

While plaintiff perforce advances these contentions without having seen any of the documents listed in the Privilege Log, the questions he raises are appropriate. On the first two issues, HN2[↑] defendants bear the burden of showing that a particular [*4] document is privileged. HN3[↑] Plaintiff bears the burden of showing the applicability of the crime-fraud exception.

For the reasons stated in _Renner IV_, the Court conducted an _in camera_ review of the documents in question, and now announces its rulings.

I

Preliminarily it may be noted that defendants' claims of privilege are frequently too broad.

For example, and judging by their Privilege Log, defendants believe, or at least profess to believe, that any reference to any communication between Gerald Townsend and one of his attorneys on any document shields that entire document from disclosure, whether or not the document reveals communications made by Townsend to his attorneys in confidence and for the purpose of obtaining legal advice. But such a showing is essential to assertion of the attorney-client privilege. "HN4[↑] The practical consequence of the privilege is that there can be neither compelled nor voluntary disclosure by the

---

[1] The background and circumstances of this case are stated in the Court's prior opinions, familiarity with which is assumed: _Renner I, 1999 U.S. Dist. LEXIS 978, 1999 WL 47239_ (S.D.N.Y. Feb. 3, 1999); _Renner II, 2000 U.S. Dist. LEXIS 8552, 2000 WL 781081_ (S.D.N.Y. June 16, 2000); _Renner III, 2001 U.S. Dist. LEXIS 4634, 2001 WL 388044_ (S.D.N.Y. Apr. 17, 2001); and _Renner IV, 2001 U.S. Dist. LEXIS 9766_ (July 11, 2001).

[2] At the hearing on May 2, 2001, counsel for plaintiff raised the threshold issue of whether the Townsend defendants had entered into an attorney-client relationship with Clark and the law firms in which he was at one time or another a partner. _See_ Transcript ("Tr.") at 9-11. The short answer is that the documents in question clearly establish the existence of that relationship.

attorney of matters conveyed to the attorney in confidence by a client for the purpose of seeking legal advice." Edna Selan Epstein, *The Attorney-Client Privilege and the Work-Product Doctrine* (Section of Litigation, American Bar Association, 4th ed. [*5] 2001) (hereinafter *Epstein*) at 2-3. The rationale justifying the privilege "is that an attorney may give reasonably informed professional advice only when information is given in confidence to the attorney by the client." *Id.* at 3. Consistent with that rationale, "*HN5*[⬆] the privilege tends, in most instances, to be a two-way street, protecting from compelled disclosure what is said or written to or by an attorney to the client for the purpose of seeking legal counsel." *Id.* It follows that not all documentary references to attorney-client communications or that relationship fall within the privilege. "Thus, the date on which a privileged communication took place and the identity of the persons who participated in a meeting or, in the case of a document, the persons who received copies of it, are not generally regarded as privileged." *Epstein* at 66 (citing cases). Similarly, "Federal courts uniformly allow the identity of the client and matters regarding fee arrangements to be discovered, except in the very limited circumstances when that discovery would actually reach client confidences," *Id.* at 67; "it generally follows that the billing statements that attorneys submit [*6] to clients are equally discoverable." *Id.* at 72 (citing cases). If production of such documents "will necessarily reveal client confidences," then "redactions will be ordered to protect the privileged material while allowing discovery of the nonprivileged material." *Id.*

Similarly, *HN6*[⬆] "the privilege does not extend to the general nature of the legal services the attorney was retained to perform or to the terms and conditions of the attorney's engagement." *Epstein* at 65. For that proposition *Epstein* cites *Diversified Industries,*

*Inc. v. Meredith, 572 F.2d 596, 603 (8th Cir. 1978)*, where the Eighth Circuit said:

> That memorandum contained no confidential information. It did no more than reveal the relationship between the parties, the purpose for which Law Firm had been engaged, and the steps which the Firm intended to take in discharging its obligation to Diversified. Such a document is not privileged.

The Eighth Circuit supported that assertion by citing *Colton v. United States, 306 F.2d 633, 636 (2d Cir. 1962)* ("Those questions which pertain to the date and general nature of the legal services performed by the Colton firm [*7] for the Matters should be answered as they do not call for any confidential information."), *cert. denied, 371 U.S. 951, 9 L. Ed. 2d 499, 83 S. Ct. 505 (1963)*.

Comparable restrictions exist with respect to the work-product privilege, now codified in civil cases under the caption "Trial Preparation: Materials" in *Rule 26(b)(3), Fed. R. Civ. P.* *HN7*[⬆] An attorney's work-product protection, which under the Rule comes into play only if the documents in question are "otherwise discoverable," is divided into two categories: "opinion" work product which reflects or reveals the attorney's mental processes, which the courts invariably protect; and "ordinary" work product, which "is subject to discovery upon a showing of need and hardship," *Epstein* at 481. In either event, however, following the wording of the Rule, "the work-product privilege that has developed consequently applies not to all materials in an attorney's files, but only to those materials that were prepared in anticipation of litigation or for trial." *Epstein* at 502 (citing cases). Thus "there is no work-product protection for documents prepared in the regular course of business rather than for purposes of the [*8] litigation," *Epstein* at 531 (quoting Wright and Miller, *Federal Practice and Procedure* P 2024, at

198-99 (1970); so too, "documents *prepared* for other purposes do not become protected as work product by being *examined* in anticipation of litigation." *Epstein* at 535.

Applying these principles, I will first consider the Townsend defendants' claims of privilege with respect to the documents examined *in camera*, identified by their Bates Numbers. To the extent that documents are found to be privileged, I will then consider whether that privilege is trumped by the crime-fraud exception.

II

**119-131.**

These documents consist of handwritten notes. The Privilege Log states that the author is "Doug Spaulding." Spaulding is one of the attorneys consulted by Gerald Townsend. The topic of the notes is described as "NASD," a reference to securities regulators who interested themselves in the business affairs of Townsend and the companies he controlled. To the extent that the notes are comprehensible to the uninitiated reader, they appear to reflect information received from Townsend, advice given to Townsend, and questions Spaulding was preparing to ask Townsend. **[*9]** But the notes are undated, and one cannot tell whether Spaulding wrote them during a face-to-face conversation with Townsend, or during a telephone conversation with him, or while Spaulding was reflecting in solitude. Defendants assert the attorney-client privilege. I provisionally sustain that claim of privilege, and these documents need not be produced to plaintiff at this time. But Spaulding must furnish to the Court *in camera* an affidavit stating the dates these notes were written and describing the circumstances under which they came to be written.

**132-136**

These documents consist for the most part of handwritten notes. "Don Clark" [Donald O. Clark], Townsend's principal attorney in connection with the pertinent matters, is identified as the author. NASD is the subject. The attorney-client privilege is asserted. Document 132 has stapled to it the business cards of H. Dandridge Campbell III and Robert W. Lough, on the staff of the Atlanta, Georgia office of the United States Securities and Exchange Commission ("SEC"). Document 132 also contains the handwritten notation, to the right of these business cards: "Voluntary meeting with SEC in Atl. 9/13/96 - 9:15-3: **[*10]** 00." These features suggest that Clark made these notes during a meeting attended by Townsend, Clark, and the two SEC representatives. If that is so, no attorney-client privilege can attach, since the utterances of Townsend and Clark took place in the presence of third parties, thereby waiving the privilege. Accordingly I provisionally reject the claim of privilege. If the circumstances of these notes' creation is different from what I have assumed, Clark is directed to submit an affidavit describing those circumstances and their privileged status will be reconsidered.

**137-138**

Gerald Townsend is the author of these two documents dated December 30, 1995, which he sent to Clark at Clark's then law firm, under date of December 30, 1995.

Document 137 is a letter from Townsend to Clark enclosing a check in the amount of $ 10,000 "for your fees in providing us with tax planning and tax advice," together with a xeroxed copy of the check, dated December 30, 1995. Under the principles stated in Part I, this communication is not privileged.

Document 138, a letter from Townsend to Clark also dated December 30, 1995, refers to his meeting with Clark the day before and expresses Townsend's **[*11]** understanding

2001 U.S. Dist. LEXIS 17920, *11

that "you will be doing the following for us." Four particular areas of legal activity are then described. I have considered whether this letter and the legal activities it describes relate solely to the purpose of advancing Townsend's business ventures, which would take the letter out of the attorney-client privilege. But I conclude that the privilege applies. *See SCM Corp. v. Xerox Corp., 70 F.R.D. 508, 513 (D. Conn. 1976)* ("HN8[⚓] The privilege need not be limited to legal consultations between corporations in litigation situations, however. Corporations should be encouraged to seek legal advice in planning their affairs to avoid litigation as well as in pursuing it.") (Newman, D.J.); *In re Grand Jury Subpoena Duces Tecum, 731 F.2d 1032, 1037-38 (2d Cir. 1984)* (attorneys rendered privileged legal advice, rather than unprivileged business advice, when they gave corporate client "tax advice" and "legal advice concerning the mechanics and consequences of alternative business strategies.").

Document 138 must also be considered within the context of the crime-fraud exception, discussed in Part III.

**139-141**

The attorney-client privilege [*12] is asserted with respect to three pages of handwritten notes which the Privilege Log says were authored by Gerald Townsend. No recipient is listed. The Log states the dates of composition as January 3, 1996 for document 139; January 8, 1996 for document 140; and April 25, 1996 for document 141.

I am unable to discern any privileged material in these notes. Townsend apparently kept a book of notations of conversations and reflections. The dates of the conversations or other entries appear in the right-hand margin. All three pages include entries made on dates other than those specified in the Privilege Log. No privilege can be claimed with respect to

such entries.

The Privilege Log lists "Don Clark" as the topic of documents 139 and 140. In 139, the only reference to Don Clark for January 3, 1996, the date specified in the Log, appears as one of several bullet points under the caption "Ray Wolford," from which I infer that during a conversation between Townsend and Wolford, Clark was mentioned. No privilege attaches to that. In 140, the only reference to Clark on the indicated date, January 8, 1996, is "Don Clark - good lawyer," which I take to be an evaluation someone else gave to [*13] Townsend, or Townsend gave to someone else, or Townsend jotted down as a personal reflection; [3] no privilege attaches in any event. The Privilege Log lists the topic of document 141 as "conference Don Clark re SEC," which certainly conveys an aura of privilege; but the sole entry for the specified date, April 25, 1996, under the caption "Donald Clark," says only: "Send him what I sent the SEC." From this I infer that during a conversation on that date, Clark asked Townsend to send to him material that Townsend had previously sent to the SEC. That communication reveals no confidences, and is not privileged.

[*14] Based on a review of these documents, one could plausibly imagine that a paralegal was instructed to review Townsend's notebook and remove as privileged any page that made any reference to Donald Clark. But the proper application of the attorney-client privilege requires a more demanding analysis than that.

**142-146**

---

[3] In document 140 the date "1-8-96" appears next to the name "Dr. Susse," and the reference to Clark quoted in text appears below that name and prior to the next noted date of "1-9-96," which would seem to refer to another conversation between Townsend and Wolford. Therefore it is possible that Clark's name was mentioned during a conversation on January 8, 1996 between Townsend and Susse, but document 140 does not permit that conclusion to be drawn with any certainty.

This is a letter dated April 25, 1996 from Townsend to Clark about the SEC. It falls within the attorney-client privilege.

**147-152**

These documents consist of a fax cover sheet dated April 25, 1996 that Townsend sent to Clark together with copies of letters and notices Townsend had sent to NASD and SEC regulators on January 16, 1996. These documents are not privileged.

**153**

The Privilege Log identifies this single-page document as Townsend's handwritten notes made on April 29, 1996 on the topic of "conference Don Clark re Chase and Renner." The attorney-client privilege is asserted. The privilege covers the last entry, under the caption "Don Clark," but does not extend to the prior entries. Defendants must therefore produce a redacted copy of the document.

This resolution will be adopted with respect to a number of other documents, discussed [*15] infra. As an Appendix to this Opinion (which will not be furnished to plaintiff), the Court will indicate on copies of the documents which portions may be redacted and which must be produced.

**154**

The Privilege Log identifies this single-page document as Townsend's handwritten notes made on May 1, 1996 on the topic of "conference Don Clark re Morelli, SEC, Renner and Gulf." The asserted attorney-client privilege covers some of the entries but not others. A redacted copy must be produced.

**155-161**

The Privilege Log characterizes these documents as "correspondence" from Townsend to Clark on the topic of

"Hampstead." The attorney-client privilege is asserted. In point of fact, the documents comprise a fax cover sheet from Townsend to Clark bearing the text "for your information," and forwarding copies of letters and agreements generated by Gulf Capital Resources, S.A. and Hampstead. There is nothing in these documents that falls within the privilege. I reject the assumption, implicit in defendants' presentation, that documents for which no claim of privilege could be asserted become cloaked with privilege solely because Townsend sent them to his attorney. [*16] See *In re Grand Jury Subpoena Duces Tecum, 731 F.2d 1032, 1037 (2d Cir. 1984)* HN9[⚓] ("It is important to bear in mind that the attorney-client privilege protects communications rather than information; the privilege does not impede disclosure of information except to the extent that that disclosure would reveal confidential communications."). The Gulf and Hampstead documents constitute "information" of possible relevance to the underlying issues in the case; and Townsend's brief fax forwarding those documents to Clark does not reveal any confidential attorney-client communications. As pointed out in *Epstein*, at 48:

> HN10[⚓] Clients and their attorneys often assume, erroneously, that merely conveying something to an attorney will cloak the underlying facts from disclosure. It will not.

See also *Draus v. Healthtrust, Inc., 172 F.R.D. 384, 393 (S.D. Ind. 1997)* ("The cover letter is protected by the attorney-client privilege. The attached agreement is not."); *Pacamor Bearings, Inc. v. Minebea Co., 918 F. Supp. 491, 511 (D.N.H. 1996)* ("Attachments which do not, by their content, fall within the realm of the privilege cannot become privileged [*17] merely by attaching them to a communication with the attorney."); *P & B Marina, L.P. v. Logrande, 136 F.R.D. 50, 56*

*(E.D.N.Y. 1991)* ("Merely attaching . . . documents to attorney-client communications does not constitute a basis for assigning the privilege. To permit this result would abrogate the well established rule that only the communication, not the underlying facts, are privileged.") (citations and internal quotation marks omitted) (opinion by Azrack, Mag. J., affirmed by Weinstein, D.J.). Indeed, transmittal documents themselves are not privileged unless they reveal the client's confidences. See *P & B Marina, 136 F.R.D. at 54* ("Such transmittal letters or acknowledgments of receipt that do not include legal advice nor disclose privileged matters are not subject to the attorney-client privilege.").

Were the rule otherwise, a party could shield quantities of highly relevant and fully discoverable documentary evidence through the simple expedient of conveying copies to his attorney. In *SCM Corp. v. Xerox, 70 F.R.D. 508, 514 (D. Conn. 1976)*, District Judge Newman (as he then was) put it thus: "*HN11*[💾] Legal departments are not citadels [*18] in which public, business or technical information may be placed to defeat discovery and thereby ensure confidentiality."

### 162-163

This two-page letter dated May 2, 1996 from Townsend to Clark on the topic of "Hampstead" falls within the attorney-client privilege.

### 174-176 [4]

The Privilege Log describes these documents as "correspondence" dated May 5, 1996 from Townsend to Clark on the topic of "Dr. Susse

and Mr. Renner." The attorney-client privilege is asserted. Document 174 is a fax cover sheet dated May 5, 1996 from Townsend to Clark which contains comments by Townsend about the other two documents, 175 and 176, which were attached to the fax. Document 174 falls within the attorney-client privilege. Documents 175 and 176 are copies of two communications from Paul Renner, each dated May 5, 1996, one to Susse and the other [*19] to Townsend. Neither of these documents is privileged.

### 164-167

These four documents are comprised of Townsend's handwritten notes, as to which the attorney-client privilege is asserted. The Privilege Log says they were written on May 17, 1996 for document 164; May 22, 1996 for document 165; and May 23, 1996 for documents 166 and 167. The specified topics are "conference Don Clark re SEC (164), "Don Clark" (165), and "conference Don Clark re Gulf" (166-167). Portions of these notes are privileged and may be redacted. The remaining entries must be produced.

### 168-173

The Privilege Log characterizes this group of documents as "correspondence" from Townsend to Clark dated May 28, 1996 on the topic of "SEC." The attorney-client privilege is asserted. Documents 168 and 169 comprise a two-page letter from Townsend to Clark which falls within the privilege. Documents 170 and 171 are handwritten lists of documents which Campbell of the SEC requested Townsend to furnish to him. They are not privileged. Document 172 is a copy of a letter dated May 21, 1996 Townsend sent to Gloria Russo at Hampstead in Monte Carlo, Monaco. It is not privileged. Document 173 is a copy of a [*20] fax Townsend sent to Paul Renner. It is not privileged.

---

[4] In this Opinion I follow the order in which the Privilege Log lists the documents in question, although that order departs on occasion from the Bates Numbers sequence.

## 177-179

The Privilege Log characterizes these documents as "correspondence" dated June 5, 1996 from Townsend to Clark on the topic of "SEC." Document 177 serves the function of a fax cover sheet from Townsend to Clark. It requests legal advice and falls within the asserted attorney-client privilege. Documents 178 and 179, forwarded by Townsend to Clark with document 177, are respectively a list of documents Townsend gave to Campbell of the SEC and a list of documents Campbell asked Townsend to send to him. Neither of these documents is privileged.

## 180-181

The Privilege Log characterizes these documents as "correspondence" dated June 7, 1996 from Townsend to Clark on the topic of "Gulf Capital Resources." The documents comprise a letter which falls within the asserted attorney-client privilege.

## 182

Document 182 is a page from Gerald Townsend's handwritten notebook. The Privilege Log asserts the attorney-client privilege with respect to entries made on July 3, 1996 on the topic of "conference Don Clark re Morelli, SEC and Susse." Some of the entries on document 182 fall within that description [*21] and are privileged. Other entries do not and are not. This document may be redacted before production to plaintiff.

## 183-188

The Privilege Log characterizes these documents as "correspondence" dated July 16, 1996 from Townsend to Clark on the topic of "Dr. Susse and Felix Renner." The attorney-client privilege is asserted. Documents 183 and 184 comprise a two-page letter from Townsend to Clark which is privileged. The documents forwarded with that letter, 185-188,

were sent by Townsend to third parties or received by Townsend from third parties, and are not privileged.

## 189

The Privilege Log characterizes document 189 as Townsend's handwritten notes of a conference on July 17, 1996 with Clark on the topic of "Wolford and Morelli." The notations falling within that description are privileged, but the document contains other entries for July 16, 1996 which are not privileged. The document may be redacted before it is produced.

## 190-192

The Privilege Log characterizes these documents as "correspondence" dated July 29, 1996 from Townsend to Clark on the topic of "United Carolina Bank." Document 190, a letter from Townsend to Clark, falls within the asserted [*22] attorney-client privilege. Documents 191 and 192, copies of communications between banks in Italy and the United States, are not privileged.

## 193

The Privilege Log characterizes document 193 as handwritten notes Townsend wrote on August 8, 1996 about a "conference Don Clark re SEC," and also notes written by Townsend on August 15, 1996 on the topic of "Don Clark."

I accept that the August 8 entry describes a conversation between Townsend and Clark. It falls within the asserted attorney-client privilege. It is not clear that the August 15 entry refers to a conversation or other communication between Townsend and Clark. The phrasing of the Privilege Log suggests the contrary. I conclude provisionally that this entry is not privileged, subject to a clarifying affidavit from Townsend.

Document 193 contains entries for other days which are not privileged. Accordingly the document may be redacted before production to plaintiff.

### 194-196

The Privilege Log characterizes these documents as "correspondence" dated August 12, 1996 from Townsend to Clark on the topic of "Hampstead." Document 194, a letter bearing that date from Townsend to Clark, falls within the asserted **[*23]** attorney-client privilege. Documents 195 and 196, communications from Hampstead to Townsend, are not privileged.

### 197-203

Documents 197 and 198 comprise a two-page letter dated August 12, 1996 which Townsend sent to Clark. Townsend enclosed with that letter copies of a faxed letter from Klaus Renner to Townsend bearing that date, documents 199-201, and two documents sent by Hampstead to Renner, documents 202 and 203. Townsend's letter to Clark, 197 and 198, falls within the asserted attorney-client privilege. The other documents are not privileged.

### 204

Document 204, a letter dated October 9, 1996 from Townsend to Clark, falls within the asserted attorney-client privilege.

### 205

Document 205 is a letter from Townsend to Clark dated October 15, 1996. The letter advises Clark of the addresses of four individuals that Clark wanted. Townsend's letter says nothing more. While the point is close, I will extend the attorney-client privilege to the letter because it could be read as an indirect reflection of information Townsend gave to Clark in confidence.

### 206-222

These documents consist of copies of (a) billing records generated by Clark's law **[*24]** firm Keck, Mahin & Cate, with respect to legal services rendered to the Townsend entities between September 30, 1996 and November 10, 1996, (b) letters from Townsend to Clark forwarding payment of the firm's invoices, together with copies of the checks. Although the Privilege Log describes the billing records as containing a "detailed description of legal services rendered," in fact they constitute a relatively terse chronological recitation, and give no details with respect to the contents of communications between Townsend and Clark or other attorneys at the firm. As noted in Part I, billing records that attorneys submit to clients are generally discoverable, unless production will necessarily reveal client confidences. These documents do not do that, and they are not privileged.

### 223-224

These documents comprise a two-page letter dated January 13, 1997 from Townsend to Clark, which falls within the asserted attorney-client privilege.

### 225

This document is the first page of a letter dated April 8, 1997 that Townsend sent to Clark (who had moved to another law firm, Reed Smith Shaw & McClay of Washington, D.C., which now represents Townsend and his companies). **[*25]** The Privilege Log describes the topic of the letter as "NASD Complaint." While the first page of this letter suggests that the entire document falls within the asserted attorney-client privilege, no conclusion can be reached until the full letter is submitted to the court for *in camera* review. Defendants will be directed to do that.

### 226-229

These four one-page letters, written by Townsend to Clark on April 18, April 25, May 22, and May 30, 1997, fall within the attorney-client privilege.

However, the April 25 letter, document 227, recites that it encloses "a copy of the letter I received from George Lunganoiu in Charleston, S.C. concerning the $ 500,000 Demand Note between Hampstead and Townsend Financial Group, Ltd." That document was not included in the material submitted for *in camera* review. It is plain from the document's description that it is not privileged. Therefore the Lunganoiu letter should be produced to plaintiff, if that production has not already been made during discovery.

**230**

This is a one page letter dated July 8, 1997 from Townsend to Douglas Spaulding, an attorney at the Reed Smith firm. The letter does no more than transmit a copy [*26] of an NASD complaint. It is not privileged.

**231-236**

These documents comprise a letter dated July 14, 1997 from Spaulding to Townsend, enclosing a draft of a letter the Reed Smith firm prepared for transmission by it to Alan Wolper, an NASD attorney, relevant to the NASD's complaint against Townsend Financial Services Corp. The attorney-client privilege is asserted.

This is a draft of a letter to be sent to a third party, and "*HN12*[⚓] the fact that the document is to be sent to a third party ordinarily removes the cloak of confidentiality necessary for protection under the attorney-client privilege." *U.S. Postal Service v. Phelps Dodge Refining Co., 852 F. Supp. 156, 163 (E.D.N.Y. 1994)*. Drafts of documents "may be considered privileged if they were prepared for

the purpose of obtaining legal advice and/or contain information a client considered but decided not to include in the final version"; the privilege may also attach if the party asserting it shows that "a confidential communication was eliminated from the final document." *Id. at 163*. Defendants, whose burden it is to sustain the privilege, make no such showings. These documents are not [*27] privileged.

**237-239**

These documents comprise a two-page letter dated July 17, 1997 from Spaulding to Townsend, documents 237 and 238, enclosing a copy of a faxed letter dated July 16, 1997 from Alan Wolper at the NASD to Spaulding, document 239. Documents 237 and 238 fall within the attorney-client privilege. Document 239 does not.

**240**

This is a one-page letter dated July 22, 1997 from Spaulding to Townsend. The letter recites that attached to it is "a copy of Corrective Action which I have prepared for your consideration in connection with the settlement of the above-referenced NASD complaint." The attachment is not included in defendants' *in camera* submission. Given the authorities cited *supra*, it would appear that neither the transmittal letter nor the draft of a document to be given to a third party are privileged. Defendants are directed to submit the attachment to the Court for *in camera* review.

**241**

This document is an e-mail sent on August 14, 1997 by Townsend to Clark. It falls within the attorney-client privilege.

**242-246** [5]

---

[5] For these documents and all documents discussed hereafter, defendants assert both the attorney-client privilege and the attorney's work-product privilege, except as indicated

[*28]  These documents comprise a letter dated August 18, 1997 from Townsend to David Ober, another attorney at the Reed Smith firm (document 242), forwarding to Ober for his attention two letters from George Lunganoiu to Townsend (documents 243-244 and 245), the latter attaching a copy of a $ 500,000 demand note signed by Townsend as president of Townsend Financial Group, Inc. (document 246). Townsend's letter to Ober is nothing more than a transmittal letter, and reveals no confidences. That letter is not covered by the attorney-client privilege, and neither are the documents enclosed with it. None of these documents was prepared in anticipation of litigation or for trial, and so the work-product privilege does not apply.

### 247

The Privilege Log characterizes this document as Townsend's handwritten notes of a conference on October 1, 1997 with Clark on the topic of "grand jury investigation." Only the attorney-client privilege is invoked. The entry for that day under the caption "Don Clark" is covered by the privilege. The other entries on document 247 are not. The document may be redacted before it is produced to plaintiff.

### 248-257

The Privilege Log characterizes [*29] these documents as "correspondence" dated October 24, 1997, authored by Townsend and sent to Clark and Ober. Document 248 is a fax transmittal form. Neither asserted privilege applies to it. The remaining documents in this group accompanied 248. Documents 249-250 comprise a letter dated October 24, 1997 from Townsend to Clark. It falls within the attorney-client privilege. Documents 251-257 are copies of a summons and complaint served upon Townsend and other defendants in the United States District Court for the District of South Carolina, Charleston Division, by George Lunganiou, together with copies of the $ 500,000 demand note executed by Townsend and wire instructions Townsend received from Hampstead. These documents are not covered by either privilege.

### 258-263

These documents comprise a transmittal letter dated October 31, 1997, from Ober to Thomas S. Tisdale, Jr., Esq., an attorney in Charleston, S.C., who was retained to represent Townsend in the Lunganiou action referred to in the preceding paragraph of this Opinion, and copies of the other documents described therein. These documents are not covered by either privilege.

### 264

This letter dated November 5, 1997 from [*30] Tisdale to Ober falls within the work-product privilege because it reveals an attorney's mental processes.

### 265

This letter dated November 12, 1997 from Ober to Townsend falls within the work-product privilege because it reveals an attorney's mental processes. However, Ober's letter begins: "Enclosed please find copies of documents we received from George Lunganiou's counsel." Those documents are not provided to the Court, and so document 265 is incomplete. Defendants are directed to submit them to the Court for *in camera* review.

### 266-268

These documents comprise a transmittal letter dated November 17, 1997 from Tisdale to Ober forwarding a copy of a consent order extending Townsend's time to answer the Lunganiou complaint. These documents are not covered by either privilege.

---

otherwise in the text.

#### 269

This status letter dated December 3, 1997 from Tisdale to Ober is covered by the work-product privilege.

#### 270-271

This two-page letter dated December 17, 1997 from Townsend to Ober falls within the attorney-client privilege.

#### 272-340

These documents consist of letters between Ober, Tisdale and Townsend concerning the drafting and filing of papers [*31] (a memorandum of law and an affidavit by Townsend) in support of a motion by Townsend to dismiss the Lunganiou complaint. The attorney-client privilege is not implicated, with the sole possible exception of changes Townsend made in his draft affidavit. To the extent that the attorney-client privilege does not apply, all these documents are covered by the work-product privilege.

#### 341

This status letter dated January 30, 1998 from Tisdale to Ober falls within the work-product privilege.

#### 342-346

Documents 342 and 345-346, a status letter dated February 3, 1998 from Ober to Townsend and a fax cover sheet, fall within the work-product privilege. Its enclosure, a copy of the district court's scheduling order (documents 343-344), was not prepared by an attorney, is a public document, and is not privileged.

#### 347-351

Document 347, a status letter dated February 13, 1998 from Ober to Townsend, and document 351, its fax cover sheet, fall within

the work-product privilege. Its enclosure, a copy of Lunganiou's memorandum in opposition to Townsend's motion to dismiss the complaint (documents 348-50), was not prepared by an attorney representing Townsend, is a public [*32] document, and is not privileged.

#### 352

The Privilege Log characterizes this document as Townsend's handwritten notes of conferences on February 18, 1998, on the topic of "SEC," and on February 19, 1998, on the topic of the Lunganiou case. On inspection, it is clear that the entries for both dates reflect Ober's reports to Townsend about the district court hearing on Townsend's motion to dismiss the Lunganiou complaint. During the February 18 conversation, Ober described to Townsend the arguments of counsel and the district judge's apparent reaction to them. In the February 19 conversation, Ober advised Townsend that the court had dismissed the complaint. Nothing in these notes falls within the attorney-client privilege, but they are all covered by the work-product privilege.

#### 353

The Privilege Log characterizes this document as Townsend's handwritten notes of conferences with Ober on February 20, February 25, and March 2, 1998. The notes indicate that Townsend had been served with Renner's complaint. Townsend and Ober discussed that suit during these three conversations. These notes fall in part within the attorney-client privilege; and, to the extent they do not, [*33] the notes reflect Ober's advice and mental processes with regard to defending against the Renner suit, and fall within the work-product privilege.

#### 354-360

These documents consist of status letters during the period March 4-11, 1998, from Tisdale to Ober and Ober to Townsend relative to the district court's order dismissing the Lunganiou complaint. They all fall within the work-product privilege, except for documents 359-360, which comprise a copy of District Judge Norton's order dated and filed February 17, 1998, [6] a public document which is not privileged.

### 361

This is a letter dated April 1, 1998 from Ober to Townsend enclosing the final invoice of Tisdale's firm after the Lunganiou litigation had been terminated by Judge Norton's order of dismissal. It does not fall within either privilege.

### 362

The [*34] Privilege Log characterizes this document as Townsend's handwritten notes of conversations on March 11, March 25, and April 14, 1998 with Spaulding and/or Ober on the topic of "Renner v. Townsend," litigation that was pending on those dates. Both privileges are invoked. The relevant entries are partially covered by the attorney-client privilege, and to the extent they are not, are covered by the work-product privilege.

### 363

The Privilege Log characterizes this document as Townsend's handwritten notes on June 4, 1998 on the topic of "Reed Smith - Doug Spaulding, David Ober and Don Clark." That designation of topic contains the entire text of the document, which accordingly reveals no confidential communication and does not fall within the attorney-client privilege, the only privilege invoked.

---

[6] Apparently Tisdale and Ober did not become aware of Judge Norton's order until two days after it had been filed. See discussion supra concerning document 352.

### III

It is now necessary to consider whether any of the documents to which the attorney-client or work-product privilege would otherwise attach fall within the crime-fraud exception, a subject discussed in _Renner III, 2001 U.S. Dist. LEXIS 4634, 2001 WL 388044_ at *2.

### A. _The Governing Law_

To recapitulate Second Circuit authority, _HN13_[⚓] application of the crime-fraud exception requires a two-pronged [*35] showing. "A party wishing to invoke the crime-fraud exception must demonstrate that there is a factual basis for a showing of probable cause to believe that a fraud or crime has been committed and that the communications in question were in furtherance of contemplated or ongoing criminal or fraudulent conduct." _United States v. Jacobs, 117 F.3d 82, 87 (2d Cir. 1997)_. "Probable cause" in this context means a factual basis sufficient to "strike a prudent person as constituting a reasonable basis to suspect the perpetration or attempted perpetration of a crime or fraud, and that the communications were in furtherance thereof." _Jacobs, 117 F.3d at 87_ (citations and internal quotation marks omitted).

With respect to the second necessary showing, that a particular document is in furtherance of a crime or fraud, the Second Circuit has rejected a "relevant evidence" test, that is to say, an inquiry limited to "whether the material sought might provide evidence of a crime or fraud." _In re Richard Roe, Inc.,168 F.3d 69, 71 (2d Cir. 1999)_ (citing and quoting _In re Richard Roe, Inc., 68 F.3d 38, 40-41 (2d Cir. 1995))_. Instead, [*36] the Second Circuit imposes the more stringent requirement that

there be (i) a determination that the client communication was _itself_ in furtherance of

the crime or fraud and (ii) probable cause to believe that the particular communication with counsel or attorney work product was *intended* in some way to facilitate or conceal the criminal activity.

*Richard Roe, 168 F.3d at 71* (citation and internal quotation marks omitted; emphases in original); *see also Jacobs, 117 F.3d at 88* ("It does not suffice that the communications may be related to a crime. To subject the attorney-client communications to disclosure, they must actually *have been made with intent to further an unlawful act.*" (quoting *United States v. White, 281 U.S. App. D.C. 39, 887 F.2d 267, 271 (D.C. Cir. 1989)* (Ruth Bader Ginsburg, J.) (emphasis in original)).

Guided by these authorities, I must consider, first, whether the record evidence independent of the communications asserted to be privileged furnishes probable cause to believe that Townsend committed fraud against Renner; and second, whether any of Townsend's communications with his attorneys [*37] were in furtherance of that fraud, contemplated or ongoing.

B. *Did Townsend Engage in Fraudulent Conduct Against Renner?*

There is no question that the evidence adduced during discovery compels the inference that Dr. Gustav Susse defrauded plaintiff Klaus Renner of $ 3 million. While counsel for the Townsend defendants stop just short of formally admitting Susse's fraud, there is no genuine question about it. But Susse's fraud is not the focal point of the inquiry into whether Townsend's communications with his attorneys fall within the crime-fraud exception. The question posed by the applicability of the crime-fraud exception is whether the record evidence furnishes probable cause to believe that Townsend, knowing of Susse's fraudulent conduct, acted with the purpose of furthering that fraud as a participant or an aider and

abettor. [7] For the reasons that follow, I answer that question in the affirmative.

[*38] Before becoming associated with Gustav Susse, Gerald Townsend, in the words of his counsel at the May 2, 2001 hearing, "was a small broker-dealer and had virtually no custody of customer funds or securities and as such had a very minimal net capital requirement under the NASD rules." Tr. 44-45. Counsel continued:

> With his involvement in this trading program of Dr. Susse's and the notion that he [Townsend] would be asked to hold customer funds, particularly customer funds in the magnitude of $ 5 million, for example, *with the Gulf money*, it became necessary, it became very clear to him and he embarked upon discussions with the NASD regulators as to what he needed to do to satisfy that obligation.

Tr. 45 (emphasis added).

Counsel's reference to $ 5 million of "the Gulf money" is significant for reasons that will shortly appear. First, however, one must consider the document that evidences the beginning of Townsend's association with Susse: an "Asset Management Agreement" dated August 24, 1995. Pl. Ex. I.A in Support of Plaintiff's Present Motion. [8] That agreement identified Hampstead Trust Limited ("Hampstead"), an entity controlled by Susse, as the "Client" [*39] and Townsend Financial Services Corp. ("Townsend Financial"), an

---

[7] *HN14*[ ] The elements of a claim of aiding and abetting fraud are the existence of a fraud, the defendant's knowledge of the fraud, and the defendant's substantial assistance to advance the fraud. *See Wight v. Bankamerica Corp, 219 F.3d 79, 91 (2d Cir. 2000)* (applying New York law); *see also Armstrong v. McAlpin, 699 F.2d 79, 91 (2d Cir. 1983)* (stating elements of claim of aiding and abetting securities law violation under federal law).

[8] Subsequent references are to exhibits from the same source unless otherwise stated.

entity controlled by Gerald Townsend, as the "Asset Manager." The preamble recited, *inter alia*, that "the Asset Manager has the ability and expertise with regard to managing and arranging financial transactions as referred to herein." The agreement provided that Hampstead would open an account with Townsend Financial; that Townsend Financial would open "operative accounts under its name" in the United States; and that Hampstead as Client "shall transfer sufficient funds, collaterals et., [sic] to his account to enable Asset Manager [Townsend Financial] to effect the transactions instructed by Client." Pl. Ex. I.A at PP 4.1-6. The agreement also provided that as between Townsend Financial and Hampstead, "Asset Manager shall only act for and on behalf of the Client and can not be made responsible and/or liable for any losses or damages caused by the Client's instructions." *Id.* at P 7.1. Whatever effect that provision might have with respect to the liabilities of Hampstead and Townsend Financial *inter se*, there is no basis for suggesting that it binds third parties, such as investors attracted by Hampstead. **[*40]**

### 1. The Gulf Transaction

Hampstead did indeed attract investors. Plaintiff Klaus Renner was one of them; but Renner was preceded in that capacity by a Luxembourg entity called Gulf Capital Ressources [*sic*], S.A. ("Gulf"). Hampstead and Gulf entered into a "Project Financial Agreement" dated November 17, 1995, another document drafted by Susse. Pl. Ex. I.B. That agreement referred to Hampstead as "Lender" and Gulf as "Borrower"; recited, *inter alia*, that "Lender is proprietor of a business-mechanism, which includes the necessary know-how to arrange credit-lines for project-financing"; that "Borrower has a project to be financed"; and that "Lender agrees to finance the project to Borrower for a total amount of $ 25,000,000 (twenty-five million U.S. dollars)

through work-product progress payments," in accordance with a payment schedule appearing in Addendum Two. The agreement identified "Townsend Financial Serv. **[*41]** Corp." as the Lender's "Security House." Addendum One.

The agreement between Hampstead and Gulf made it plain that the Hampstead financial pump, purportedly able to generate a stream of "work-product progress payments" totalling $ 25 million payable *to Gulf*, had to be primed by a $ 5 million payment *from Gulf*. Thus Addendum One to the agreement provided in pertinent part that Gulf, acting through two designated individuals [9]

> hereby give to the Security House Townsend Financial Serv. Corp. this irrevocable instruction to issue, against our down-payment amounting to $ 5,000,000 (five million USD) a "custody receipt confirmation" duly signed by two bank officers . . . .
>
> Furthermore, we instruct the Security House Townsend Financial Ser. Corp. to enable Hampstead Trust Ltd. to leverage 1x5 the down-payment, in order to issue a documentary letter of credit, amounting to $ 25,000,000 (twenty-five million USD) in favor of Golf [*sic* **[*42]** ] Capital Ressources, S.A.

In short, the Hampstead-Gulf agreement was designed to make Gulf believe that Hampstead's proprietary "business-mechanism" would transform Gulf's "down-payment" of $ 5 million into $ 25 million in "work-progress payments" that Hampstead would make to Gulf. The shadowy figure of the medieval alchemist comes irresistibly to mind. [10]

---

[9] Messrs. Didier des Cressonniers and Jean-Claude Pittet.

[10] "**Alchemist**: One who studies or practices alchemy."

The record shows that on November 22, 1995, Townsend received a $ 5 million wire transfer from Hampstead. *See* Ex. C to plaintiff's brief dated April 18, 2001. It is common ground that this amount was furnished to Hampstead by Gulf as the "down-payment" called for by the Hampstead-Gulf [*43] agreement.

In these circumstances, I cannot accept Mr. Spaulding's submission at the May 2 hearing that this $ 5 million in the Gulf transaction differed materially from the $ 3 million transaction involving plaintiff Renner because "in the case of the Gulf transaction, the funds were Hampstead's money," that "could be dealt with by Hampstead however it felt it wanted to." Tr. 40. That argument exalts form over substance. The $ 5 million Townsend received on November 22, 1995 from Hampstead was Gulf's money, and Gerald Townsend knew it. That knowledge is reflected by Townsend's letter to Susse dated April 24, 1996, Pl. Ex. III.C. Gulf had received nothing from Hampstead; and Townsend had received inquiries from one Marc Shafran of the SEC, who was conducting an investigation "centered around the handling by us [Townsend] of customer funds" and "whether or not Hampstead was engaging in 'Prime Bank Fraud.'" Townsend advised Susse in his April 24, 1996 letter that Shafran had demanded "a copy of the transfer of the $ 5,000,000 *from Gulf* as well as the Gulf-Hampstead contract," and that Shafran "is already aware that Gulf has not been repaid *their $ 5,000,000* yet" (emphasis [*44] added). Townsend's letter to Susse goes on to say:

Mr. Cressonnieres just called me, while I was typing this letter. He said that you told

him *his $ 5,000,000* would be transferred today. He was very angry when I informed him that I had not sent *his funds* back.
(emphasis added).

I conclude from this evidence that Mr. Spaulding had it right when, in his oral submission on May 2, 2001, he referred to Townsend's involvement "with the Gulf money."

The record indicates that Gerald Townsend was familiar with the Gulf-Hampstead contract at the time Townsend Financial received the $ 5 million on November 22, 1995, and knew that this amount related to that contract. Accordingly Townsend knew that Hampstead had encouraged Gulf to believe that its $ 5 million "down-payment" would be leveraged into a $ 25 million bank letter of credit in Gulf's favor. But what did Townsend do with that $ 5 million? Ex. C -- a Townsend-generated document -- gives the answer. The $ 5 million was initially wired to a Townsend account at the United Carolina Bank. From that account, on November 29 Townsend distributed $ 2 million to Amalia Carver Paszkowski and $ 200,000 to Wolford Brothers. On [*45] December 4 Townsend distributed $ 100,000 to Alex Penly, paid himself the $ 50,000 retainer called for by his agreement with Hampstead, and distributed $ 200,000 to one of the Townsend companies. That left $ 2.4 million of the $ 5 million left in the United Carolina Bank. On December 8 Townsend transferred that amount to the Chase Bank. He then distributed all those funds to a similarly eclectic group of distributees: on December 14, $ 540,000 to Karl Linder; and on December 28, $ 500,000 to Peter Susse (a brother of Gustav Susse), $ 50,000 to Richard E. Morrison, and $ 300,000 to the most colorful recipient of all, the "Knights of Malta."

So Gulf's $ 5 million "down-payment" was entirely dissipated, and it is difficult to believe

---

"Alchemy: a medieval chemical science and philosophy aiming to achieve the transmutation of the base metals into gold." *Webster's New Collegiate Dictionary* (1976) at 27. I do not mean to suggest that $ 5 million in U.S. currency constitutes a "base metal," but the thought association seems fair enough.

that these distributions reflect a good faith effort to leverage the funds into bank letters of credit for Gulf's benefit, in the amount of $ 25 million or any other. The evidence compels the inference that Susse defrauded Gulf; but, as noted, I must focus upon Townsend. I accept for the purpose of this analysis that Townsend made these distributions on Susse's instructions or (in the case of the two distributions to the Townsend interests) with Susse's [*46] authority. But I conclude without difficulty that the evidence furnishes probable cause to believe that Townsend knew Susse, through the medium of Hampstead, was defrauding Gulf, and that Townsend knowingly participated in or aided and abetted that fraud. This remarkably varied collection of distributees ran up too many red flags.

Although Renner, not Gulf, is the plaintiff in this action, I have discussed the Gulf transaction at some length because I think it is probative of the manner in which Gustav Susse and Gerald Townsend dealt with each other and with other people's money. I am inclined to the view -- although I need not decide the point at this time -- that at the trial of the Renner case, plaintiff would be entitled to offer evidence of the Gulf transaction as proof of Townsend's "motive, opportunity, intent, preparation, plan, knowledge, . . . or absence of mistake or accident," *F. R. Evid. 404(b)*.

## 2. The Renner Transaction

I turn now to the record evidence concerning the transaction between Hampstead Trust Limited and Klaus Renner.

Hampstead and Renner entered into a "Management Agreement" dated February 7, 1996, a document prepared in Susse's distinctive graphic [*47] style. Ex. A to Defendants' Answer to Plaintiff's Omnibus Discovery Report. That agreement referred to Hampstead as "Supplier" and Renner as

"Client"; recited, *inter alia*, that "Supplier is proprietor of a business-mechanism, which includes the necessary know-how to execute each purchase and sell transaction of 'medium term bank debentures'"; and that "Client has available funds, amounting to $ 3,000,000 (three million U.S.D.) ready for transfer by swift wire"; [11] and that "Supplier will pay to Client a weekly profit-sharing amounting to 3% (three percent) from the amount of $ 3,000,000 (three million U.S.D.) - 40 business weeks per annum, with monthly payments." Addendum One, signed for Hampstead by Susse and Alex Penly as "director," and by Renner on his own behalf, identified Townsend Investment Funds LLC as Supplier's "Security House," and recited Renner's giving to Townsend an "irrevocable instruction to receive swift funds by swift wire, amounting to $ 3,000,000 (three million U.S.D.) . . . and to cause the issue of a 'custody receipt confirmation' duly signed by Chase Manhattan Bank N.A., New York." Addendum One also provided:

> Furthermore, we instruct you to enable [*48] Hampstead Trust Ltd. -- as Supplier -- to purchase directly from the top 25 West European issuing banks, medium term bank debentures on a "payment versus delivery" basis, at a pre-fixed price, and to resell the same bank instruments, at a pre-fixed price, on a "delivery versus payment" basis -- only in case of a net profit of 3% (three percent) -- 40 (forty) business weeks per annum.

Whatever this language may mean, it appears intended to describe the manner in which Hampstead would generate for Renner the 120% profits per annum (3% per week times

---

[11] According to the allegations of his amended complaint, in February 1996 Renner, "who had invented a snow-removing machine, was seeking capital to manufacture and sell the invention." *Renner II, 2000 U.S. Dist. LEXIS 8552, 2000 WL 781081* at *2. Susse touted the Hampstead agreement to Renner as a means of raising that capital. *Id.*

2001 U.S. Dist. LEXIS 17920, *48

40 weeks) that Renner would receive on his $ 3 million investment. To complete this documentary blandishment, Addendum One also provided:

> The present instructions also provide that the invested sum of $ 3,000,000 (three million U.S.D.) has to return free and without any deduction after the period of 365 (three hundred and sixty-five) days, without demand, to the bank coordinates as per annex "two."

Thus Susse persuaded Renner to expect that Renner would receive in one year, on his investment of $ 3 million, interest in the amount of $ 3.6 million (3% per week times 40 weeks), and the return of the $ 3 million principal [*49] at the end of the year.

What actually occurred, according to the allegations of the amended complaint, is recited in *Renner II, 2000 U.S. Dist. LEXIS 8552, 2000 WL 781081* at *2-*3. I briefly reiterate them here. On February 13, 1996, the Chase branch in Mount Vernon, New York received $ 3 million from Renner by wire transfer. On that date, Michelino Morelli, the branch manager and initially a defendant in this case, advised Townsend of the receipt of those funds. On February 15, Morelli advised Townsend by fax that Renner's $ 3 million had been deposited in the Townsend Fund account. Thereafter Townsend, on Susse's instruction, directed Morelli at Chase to wire $ 718,000 from the Townsend Fund account [*50] to an account in an Italian bank. Chase complied. On February 23, Townsend instructed Morelli to wire an additional $ 2.7 million from the Townsend Fund account to a Monaco account belonging to Gloria Russo, Susse's common law wife. Susse and Russo used that money to purchase a villa in France. On February 27, Townsend arranged for Morelli to wire $ 100,000 out of the Townsend Fund to an Arab bank account in Geneva belonging to Alexander Penly, who signed

Hampstead's agreement with Renner as a Hampstead director. On March 4, responding to inquiries from Renner's bank in Switzerland, Townsend falsely stated that Renner's money continued to be held in an account at Chase, whereas in fact it had been diverted as described above. On April 3, 1996, in response to Renner's continued inquiries and demands, Townsend wired $ 80,000 to Renner. This is apparently the only portion of the $ 3 million Renner wired to Chase that he recovered through the Chase/Morelli/Townsend apparatus.

This narrative, particularly its chronology, plainly suggests a scheme devised by Susse to defraud Renner, in which Townsend participated or aided and abetted. However, the narrative is drawn from the allegations [*51] in Renner's amended complaint; *Renner II* decided the several defendants' motions to dismiss the complaint for legal insufficiency under *Rule 12(b)(6), Fed. R. Civ. P.* [12] Ordinarily one might question whether the showing necessary to invoke the crime-fraud exception can be derived from allegations in a pleading. In the case at bar, however, other circumstances are present. At the May 2, 2001 hearing, counsel for Townsend did not dispute the chronology of the payments in and out of the Chase and Townsend Fund accounts previously described.

Moreover, Townsend's prior submissions in this case include references to a criminal prosecution Renner instituted against Susse and Russo in France. *See* Townsend Defendants' Answer to Plaintiff's Omnibus Discovery Report and Ex. F. thereto. [*52]

--------

[12] Certain claims were dismissed, but the Townsend defendants' motion to dismiss was "denied as to the first and eighth causes of action, namely for fraud and commercial bad faith." *Renner II, 2000 U.S. Dist. LEXIS 8552, 2000 WL 781081* at *24.

That filing states that "Susse and Russo were tried before a French Court in Nice on May 5, 2000," both were "found guilty of civil and criminal wrongdoing," each was given a criminal sentence, and "each was adjudged to be civilly liable to Renner for $ 3,784,000, the amount of damages he had claimed were due his [sic] as a result of the fraud Susse had perpetrated on him." Id at 7.

Ex. F to this submission is a copy in translation of the criminal judgment dated June 2, 2000 of the Nice Law Court. This 16-page document contains a detailed statement of the facts found by the three-judge panel of the Nice Court to have been proven during the trial (at which Renner and Russo, among others, testified; Susse apparently defaulted in appearance), and concludes with the judgment that Susse and Russo were guilty of the offense of "complicity to fraud." Susse was sentenced to five years' imprisonment and fined; an arrest warrant was issued for him. Russo was given a suspended sentence and fined. As noted in defendants' submission, both Susse and Russo were adjudged liable to Renner for fraud in an amount in excess of $ 3 million.

The findings and conclusions of the Nice Court give [*53] some additional details with respect to the $ 2.7 million which Morelli at Chase, acting on Townsend's instructions, wired to Gloria Russo to use in purchasing a villa in Monaco. At one point during the criminal investigation in France, Susse appeared before the Examining Magistrate. Ex. F at 12. [13] [*54] The Nice Court's judgment, basing its findings upon proof adduced before it and Susse's statements to the Examining Magistrate, states in pertinent part:

> It became obvious in this case that TOWNSEND had transferred the amount of 2,700,000 $ by order of SUSSE on February 23rd, 1996, to the "Credit Foncier de MONACO." During the hearing concerning this file document, SUSSE specified that this money was to be used for the purchase of a guarantee related to a letter of credit from the Dubai Bank.
> Before the Examining Magistrate, SUSSE declared: "As the money was available at the Credit Foncier de MONACO, I used it to buy a villa for my wife, as my personal funds were blocked due to future financial investment operations.

Ex. F at 12 (document references omitted). [14]

Given this record evidence, I conclude that plaintiff Klaus Renner has shown there is probable cause to believe that Townsend participated in, or aided and abetted, a fraud perpetrated by Gustav Susse upon Renner.

I think it is only fair to stress that the foregoing should not be read as expressing or intimating [*55] any opinion on the part of this Court as to whether Gerald Townsend or any of his companies did in fact defraud Renner. Townsend denies that charge, and consequently it is for the jury at the end of the trial to decide whether or not Renner has proved it. I have engaged in this probable

---

[13] "Examining magistrate" is the English translation for the French title Juges d'instruction, judicial officers "who receive in cases of criminal offenses the complaints of the parties injured, and who summon and examine witnesses under oath, and, after communication with the procureur imperial, draw up the forms of accusation." Black's Law Dictionary (4th ed. 1951) at 941.

[14] The Nice Court's judgment, after discussing in detail the incorporation of Hampstead Trust Limited and Susse's relation to it, went on to say: "A second company participated in this type of operation, i.e., the TOWNSEND INVESTMENT FUNDS company." Ex. F at 9. At the May 2, 2001 hearing, counsel for Renner argued from this language that the French Court "found that there was a fraud and that Townsend was a member of it." Tr. 12. I do not read the judgment of the Nice Court as going that far; Townsend does not deny that his company "participated" in Susse's operations, and Townsend was not on trial before the Nice Court. But I think that I can consider the Nice Court proceedings in determining whether Renner has made the requisite showing in this Court to invoke the crime-fraud exception.

cause analysis because that is what the governing law requires me to do.

## C. Were Any Communications between Townsend and His Attorneys in Furtherance of that Fraud?

Document 138 is a letter dated December 30, 1995 that Gerald Townsend sent to Donald Clark at the Keck, Mahin firm. The letter begins:

> Charley, Mike and I enjoyed our meeting with you yesterday and appreciate the time you spent with us.
> Based on our meeting, our understanding is that you will be doing the following for us:

There follows a four-paragraph recitation of the several legal services that "Charley, Mike" and Townsend contemplated Clark and his firm would render to them.

Details about who was involved and the circumstances of this December 29, 1995 meeting may be gleaned from the affidavit of Charles Weaver, Pl. Ex. II.A on this motion. Weaver is a businessman in Raleigh, as is Townsend. In "mid 1995" [*56] Weaver, Townsend, and one Michael Atkins "discussed forming an investment group, the Townsend Financial Group, which was to offer to investors a high yield investment program." Weaver Affidavit at 2. Donald Clark had been Weaver's attorney for some 14 years, and Weaver had preliminary consultations with Clark "with regard to the formation of the Townsend Financial Group." Id. Weaver, Atkins and Townsend then "received an invitation to meet with Gustav Susse at his home in Monte Carlo to discuss a business relationship between the Townsend Financial Group and Susse's group, the Hampstead Partnership." Id. In September 1995, Weaver, Atkins and Townsend traveled together to Monaco to meet with Susse "and discuss this business arrangement." Id. Following the trio's return to the United States, Weaver introduced

Townsend to Clark, "so that Townsend could discuss with Clark how the Townsend Financial Group could represent Susse in the United States," and Clark could advise Townsend "about the appropriate structure for the Townsend Financial Group to do business with Hampstead overseas." Id. at 2-3. As document 138 shows, Weaver, Atkins and Townsend all met with Clark on December 29, 1995 to [*57] discuss these matters. While Weaver had understood that he and Atkins would be shareholders in Townsend Financial Group, in fact they never received shares in that venture. Id. at 3.

In these circumstances, I attach a particular significance to one of the paragraphs in Townsend's December 30, 1995 letter to Clark, summarizing the legal services that Clark would perform. That paragraph reads:

> Making it clear what the "Account Instructions" on agreements between Hampstead and their clients need to say in order to make it clear that Hampstead's clients are asking us to follow exactly any and all instructions we receive from Hampstead and for us to avoid any potential liability to Hampstead's clients for following Hampstead's instructions to us.

Prior to December 30, 1995, the date of that letter, Townsend, by virtue (if that is the appropriate word) of following Hampstead's instructions, had both received Gulf's $ 5 million, intended by Gulf for investment purposes, and parceled out the entire amount to a group of distributees who were highly suspicious, to put it charitably. It is plausible to suppose that Townsend, contemplating further comparable adventures with Susse [*58] and Hampstead, would want the underlying documents drafted so as "to avoid any potential liability to Hampstead's clients [such as Gulf and Renner] for following Hampstead's instructions to us." Legal advice sought for the purpose of insulating Townsend from liability in

2001 U.S. Dist. LEXIS 17920, *58

fraud to Hampstead/Susse clients would further any fraudulent conduct on the part of Townsend by both facilitating and concealing that conduct, as well as indirectly furthering Susse's fraudulent conduct.

Accordingly, I conclude that document 138 falls within the crime-fraud exception to the attorney-client privilege, and must be produced.

No other documents which I have examined in camera fall within the crime-fraud exception. While some documents could be read in such a way as to constitute evidence of fraud, that is not sufficient under the Second Circuit rule to bring them within the exception.

IV.

The Court's rulings following its in camera inspection of the documents claimed by defendants to be privileged are summarized below.

The following documents are not privileged and must be produced:

119-31 (provisional--defendants must produce affidavit), 132-36 (provisional--defendants must produce [*59] affidavit if Court's assumption is wrong), 137, 139-41, 147-52, 155-61, 170-73, 175-76, 178-79, 185-88, 191-92, 195-96, 199-203, 206-22, enclosure to 227, 230-36, 239, 242-46, 248, 251-63, 266-68, 343-44, 348-50, 359-61, 363.

The following documents are privileged in part and must be produced after redaction:

153-54, 164-67, 182, 189, 193 (provisional--defendants must produce affidavit if Court's assumption is wrong), 247.

The material that may be redacted is specified in Appendix A to this Opinion (which will be distributed only to counsel for defendants).

The following documents are privileged and need not be produced:

142-46, 162-63, 168-69, 174, 177, 180-81, 183-84, 190, 194, 197-98, 204-05, 223-24, 226-29, 237-38, 241, 249-50, 264-65, 269-342, 345-47, 351-58, 362.

The following document must be produced pursuant to the crime-fraud exception:

138

Decision is reserved as to the privileged status of the following documents:

225 (defendants must submit entire letter in camera), 240 (defendants must submit attachment in camera), enclosures to 265 (defendants must submit enclosures in camera).

Defendants are directed to send [*60] copies of the unprivileged documents and partially privileged documents (redacted) to plaintiff no later than 10 business days from the date of this Opinion. Defendants shall provide to Chambers an identical copy of all redacted documents sent to plaintiff. Furthermore, defendants are directed to submit to court chambers the affidavits and additional documents identified above no later than 10 business days from the date of this Opinion.

It is SO ORDERED.

Dated: New York, New York

November 1, 2001

CHARLES S. HAIGHT, JR.

SENIOR UNITED STATES DISTRICT JUDGE

End of Document