**Page 1**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------x
JANE DOE,

        Plaintiff,

  - against -      Index No.
             21 CV 4332
NEW YORK CITY DEPARTMENT OF EDUCATION,  (FB)(RML)
MARK WALTZER, DOUGLAS MEINERS, MICHAEL
EISENBERG and JOHN DOES #1 through #2,

        Defendants.
------------------------------------x

September 13, 2023
10:12 a.m.

DESIGNATED SEALED BY THE ORDER OF
THE COURT

     DEPOSITION of THERESA EUROPE, a Non-Party
Witness herein, taken by the attorney for the
Plaintiff, held via web conference on the above
date and time, pursuant to Notice, and held before
Karen Viggiano, a Shorthand Reporter and Notary
Public within and for the State of New York.

**Page 2**

A P P E A R A N C E S :

MUSA-OBREGON LAW PC
Attorneys for Plaintiff
  55-21 69th Street
  Maspeth, New York 11378

BY:  KARL J. ASHANTI, ESQ.


NEW YORK CITY CORPORATION COUNSEL
Attorneys for Defendant
New York City Department of Education
  100 Church Street
  New York, New York 10007
BY:  JACQUELYN DAINOW, ESQ.
     JOHN J. DOODY, ESQ.
  File# 2021022733


STOLL GLICKMAN & BELLINA
Attorneys for Defendant
  Mark Waltzer
  300 Cadman Plaza West
  Brooklyn, New York 11201
(NOT PRESENT)

**Page 3**

1
2      THE REPORTER: It is hereby
3  stipulated and agreed by and between
4  counsel for all parties present that
5  this deposition is being conducted
6  remotely by videoconference, and that
7  the court reporter, witness, and all
8  counsel are in separate remote locations
9  and participating via Zoom or any web
10  conference meeting platform under the
11  control of the court reporting agency.
12      It is further stipulated that this
13  videoconference will not be recorded in
14  any manner and that any recording
15  without the express written consent of
16  all parties shall be considered
17  unauthorized, in violation of law and
18  shall not be used for any purpose in
19  this litigation or otherwise.
20      Before I swear in the witness, I
21  will ask each counsel to stipulate on
22  the record that I, the court reporter,
23  may swear in the witness even though I
24  am not physically in the presence of the
25  witness and that there is no objection

**Page 4**

1
2  to that at this time, nor will there be
3  an objection at a future date.
4      MS. DAINOW: So stipulated.
5      MR. ASHANTI: So stipulated.
6      (Whereupon, the witness presented
7  a New York City Department of Education
8  work ID.
9      (Thereupon, Executive Order No. 11
10  was marked as Plaintiff's Exhibit 1 for
11  identification, as of this date.)
12      (Thereupon, unredacted letter
13  dated 5/13/02 was marked as Plaintiff's
14  Exhibit 2 for identification, as of this
15  date.)
16      MS. DAINOW: I'd like to make a
17  quick record before we swear in the
18  witness.
19      First, as I mentioned to the court
20  reporter prior to Mr. Ashanti joining
21  the call, the transcript must be
22  designate sealed by order of the court.
23  So we're going to go forward under the
24  sealing by Judge Levy dated September
25  12, 2023.

```
 1              I would also request that the
 2     witness have an opportunity to review
 3     the transcript pursuant to Federal Rule
 4     of Civil Procedure 30E (1), and despite
 5     the fact this is a non-party witness,
 6     she is a employee of the Department of
 7     Education, which is my client and as
 8     such attorney/client communications are
 9     intact.  I would like to stipulate if
10     Mr. Ashanti is amenable that Mr. Ashanti
11     will give me a copy of the transcript so
12     I can review with the witness after the
13     deposition.
14          MR. ASHANTI:  Yes, I'll certainly
15     provide to the witness -- are you
16     accepting the transcript on behalf of
17     the witness?  Is that what you are
18     saying?
19          MS. DAINOW:  I am.  If Ms. Europe
20     is okay with that.
21          THE WITNESS:  Yes, I'm fine with
22     that thank you.
23          MR. ASHANTI:  Then I'll provide it
24     with you.
25
```
                                            5

```
 1                    T. Europe
 2              We're gathered so that I can ask
 3     you questions as they relate to the 30(b)(6)
 4     witness notice that I have served on New York
 5     City Department of Education which I will -- I
 6     may alternatively refer to as DOE or NYC DOE.
 7     But if however I refer to them to as Department
 8     of Education DOE, NYC DOE, you know I'll be
 9     referring to New York City Department of
10     Education; is that fair?
11          A    That's correct fair.
12          MR. ASHANTI:  Just for the record
13     as well, and I know Karen you're aware
14     of this, but the plaintiff in this
15     action is a Jane Doe.  Her true identity
16     is L.N., and her maiden name is L.C.
17     And it's previously established through
18     the stipulation of protective order
19     executed by the parties and, thereafter,
20     endorsed by the court on December 2,
21     2021, that she should remain anonymous
22     as a victim of sexual assaults and,
23     therefore, for the purposes of the
24     transcript, I would ask that whenever
25     she's been referred to, that her
```
                                            7

```
 1              MS. DAINOW:  Thank you.
 2          MR. ASHANTI:  Judge Levy made a
 3     ruling regarding sealing of this
 4     transcript and it's so stipulated.
 5              We can proceed.
 6     T H E R E S A   E U R O P E, having been first
 7     duly sworn by a Notary Public within and for
 8     the State of New York, was examined and
 9     testified under oath as follows:
10
11
12     EXAMINATION BY
13     MR. ASHANTI:
14          Q    State your name for the record.
15          A    Theresa Europe.
16          Q    State your address for the record.
17          A    52 Chambers Street, New York, New
18     York 10038.
19          Q    Good morning, Ms. Europe.
20          A    Good morning.
21          Q    My name is Karl Ashanti.  I'm
22     counsel for plaintiffs in this federal action
23     that's been brought in the Eastern District of
24     New York, Jane Doe versus New York City
25     Department of Education, et al.
```
                                            6

```
 1                    T. Europe
 2     initials be put in place of her full
 3     name.
 4          Q    Before we start the deposition, I
 5     would like to go over some ground rules so that
 6     the deposition can run smoothly and that the
 7     transcript can be as clear as possible.
 8              I would ask you that you give only
 9     verbal responses because, of course, head nods
10     or gestures cannot be transcribed onto the
11     record.
12              I would also ask that you please
13     keep your voice up so that everything you are
14     saying can be clearly heard and understood and
15     that the reporter can transcribe your testimony
16     accurately; is that fair?
17          A    Yes.
18          Q    Similarly, if there's any question
19     that, you know, you don't hear or you don't
20     hear part of, please let me know and I'll be
21     happy to repeat that for you, okay?
22          A    Okay.
23          Q    Similarly, if there's any question
24     that you don't understand, please let me know
25     and I'll be happy to rephrase that for you.
```
                                            8

                              2  (Pages 5 to 8)

T. Europe

1         It is very important that you let
2    me know if you don't understand a question.
3    Because if I ask you the question and you
4    answer it and we move on, it will be assumed
5    that you did understand the question, okay?
6         A    Okay.
7         Q    If you happen to not know the
8    answer to a question, please do not guess.
9    Perfectly fine to say that you don't know.
10        Similarly, if you happen to not
11   remember the answer to a question, it's
12   perfectly fine to say that you do not remember.
13        So that we're speaking one person
14   at a time for clarity of the transcript, I
15   would just ask that you wait until I finish
16   each one of my questions.  And I, in turn, will
17   wait until you finish each one of your answers
18   so that, you know, everything that is all
19   testimony can be taken down clearly and
20   accurately; is that okay?
21        A    Of course.
22        Q    Do you understand the oath you've
23   taken here today is to tell the truth
24   throughout the course of the deposition?

9

T. Europe

1         A    I do.
2         Q    And that oath has the same legal
3    effect, and is the same oath that any witness
4    in a courtroom before a judge and jury takes?
5         A    I understand.
6         Q    And that it's been taken under
7    penalty of perjury?
8         A    Understood.
9         Q    If during the course of the
10   deposition you realize that an answer you've
11   already given is somehow inaccurate or
12   incomplete, please let me know.  I'll give you
13   a chance to either supplement your answer or to
14   revise it, okay?
15        A    Okay.
16        Q    As Ms. Dainow alluded to,
17   subsequent to today there will be a transcript
18   of your testimony and that transcript will be
19   provided to me, the original.  I, in turn, will
20   forward the original to Ms. Dainow for her to
21   forward to you so you can review it and at that
22   time you can, you know, determine if there are
23   any inaccuracies or anything that you either in
24   transcription or that, you know, any answer

10

T. Europe

1    that you believe you were somehow mistaken
2    about or would like to supplement, when you
3    receive the transcript, you'll have that
4    opportunity; do you understand?
5         A    I do.
6         Q    However, if you do happen to make
7    any changes to the transcript once you receive
8    it, that is something that I can comment on at
9    trial; do you understand?
10        A    Yes, I do.
11        Q    If during the course of the
12   deposition you feel the need to take a break
13   for any reason, please let me know and I'll be
14   more than happy to accommodate you, okay?
15        A    Thank you.
16        Q    Is English your first language?
17        A    It is.
18        Q    Do you understand the rules of the
19   deposition as I've explained them?
20        A    I do.
21        Q    Is there any reason that you
22   cannot testify truthfully and accurately here
23   today?
24        A    No.

11

T. Europe

1         Q    Do you have any physical or mental
2    condition that could potentially interfere with
3    your ability to testify here today?
4         A    I do not.
5         Q    Have you taken any medications in
6    the last 24 hours that might interfere with
7    your ability to testify?
8         A    No, I have not.
9         Q    Have you had any medication
10   prescribed for you to take on a daily basis
11   that you failed to take today?
12        A    No.
13        Q    Have you consumed any alcohol
14   within the last 24 hours?
15        A    I have not.
16        Q    Have you consumed any drugs in the
17   last 24 hours such as marijuana or any other
18   narcotics?
19        A    No, I have not.
20        Q    The gathering for which we're here
21   is called a deposition.  It's an Examination
22   Before Trial for testimony.  The witness gives
23   testimony as part of a court proceeding.
24        Have you ever been deposed before?

12

3  (Pages 9 to 12)

T. Europe

1  
2    A   I have.
3    Q   How many times?
4    A   I couldn't say, but several.
5    Q   More than ten?
6    A   No, not more than ten.
7    Q   More than five?
8    A   Possibly.
9    Q   When was your first deposition?
10   A   I don't recall.  I just know I've
11  been deposed.  The last time I've been deposed
12  was probably 12, 15 years ago.
13   Q   When you were deposed that last
14  time 12 to 15 years ago, did you have the same
15  position that you currently have?
16   A   No.
17   Q   Were you an employee of New York
18  City Department of Education back then?
19   A   Yes, I was.
20   Q   Was that for a case for which the
21  New York City Department of Education was a
22  defendant?
23   A   Yes.
24   Q   Have you ever testified as a
25  witness in court?

13

T. Europe

1  a lawsuit either in your professional or
2  personal capacity?
3    A   Yes, I have.
4    Q   How many times?
5    A   Only in my professional capacity.
6  There's been several times where I've been
7  named along with the Department of Education.
8  I couldn't tell you how many.
9    Q   Are any of those lawsuits pending?
10   A   No.
11   Q   For any of those lawsuits, did any
12  of those lawsuits end in a civil trial?
13   A   No, I would say they probably
14  ended all in settlements.  But I was never
15  called to testify.  I was just deposed in those
16  cases, and I don't know what happened with
17  them.
18   Q   Have you ever been a witness in a
19  lawsuit where were you not a defendant?
20   A   No, I haven't.
21   Q   Have you ever been the subject of
22  a protective order or retraining order?
23       MS. DAINOW:  Objection.
24       You can answer.

15

T. Europe

1  
2    A   No.
3    Q   Have you ever been a plaintiff in
4  a lawsuit, meaning the person or entity suing?
5    A   No.
6    Q   Have you ever been the defendant
7  in a lawsuit, meaning the person or entity
8  being sued?
9    A   Let me back up.  I'm sorry.  Are
10  you talking about in my professional, personal
11  capacity?  My personal capacity I have been a
12  plaintiff.
13   Q   What kind of matter?
14       MS. DAINOW:  Objection.
15       You can answer.
16   A   I had filed suit against the
17  builder of my home.
18   Q   Is that the only lawsuit for which
19  you've been a plaintiff?
20   A   I had a divorce proceeding if that
21  counts.
22   Q   Yes and no.
23       Other than those two, any others?
24   A   No, that's it.
25   Q   Have you ever been a defendant in

14

T. Europe

1  
2    A   No, I have not.
3    Q   Have you ever been convicted of a
4  crime?
5        MS. DAINOW:  Objection.
6        You can answer.
7    A   No, I have not.
8    Q   In order to prepare for today's
9  deposition, did you meet with anyone?
10   A   I did, yes.
11   Q   With whom did you meet?
12   A   With Jacquelyn and John.
13   Q   How many times?
14   A   Twice.
15   Q   When was the first and when was
16  the second?
17   A   The second was yesterday.  The
18  first was when they were seeing if I was the
19  appropriate --
20       MS. DAINOW:  I'd like to cut the
21  witness off.  It's just a yes or no.
22  Just answer the question.
23   Q   When?
24   A   Maybe a week and a half ago.  I
25  don't know the exact date.

16

4  (Pages 13 to 16)

T. Europe

1
2    Q   Talking about the first meeting
3    now, was that in person, electronically, by
4    telephone, something else?
5        A   A Teams Meeting.
6        Q   Do not tell me anything that was
7    said during that meeting.  All I want to know
8    is who was present for the meeting.  Was there
9    anyone present besides yourself, Ms. Dainow and
10   Mr. Doody?
11       A   No.
12       Q   When was the second meeting?
13       A   Yes.
14       Q   Was that in person,
15   electronically, telephone, something else?
16       A   Electronically.
17       Q   Who was present for that?
18       A   Same.
19       Q   No one besides yourself, Mr.
20   Doody, and Ms. Dainow?
21       A   Correct.
22       Q   Have you ever communicated with
23   counsel for any other party in this action
24   besides the New York City Department of
25   Education?

17

T. Europe

1
2    Q   Executive Order Number 11 is the
3    only material that you reviewed?
4        A   Correct.
5        Q   Did you listen to any audio to
6    prepare for today's deposition?
7        A   No.
8        Q   Did anyone show you any written
9    materials in preparation for today's
10   deposition?
11       A   No.
12       Q   Did anyone show you any videos in
13   preparation for today's deposition?
14       A   No.
15       Q   Did anyone play any audio for you
16   in preparation for today's deposition?
17       A   No.
18       Q   Did you review any photographs in
19   preparation for today's deposition?
20       A   No.
21       Q   Do you have any handwritten notes
22   concerning your preparation for today's
23   deposition?
24       A   No, I don't.
25       Q   Have you ever been known by any

19

T. Europe

1
2        A   No.
3        Q   Have you ever heard the name
4    Andrew Stoll?
5        A   No.
6        Q   Did you review any documents or
7    videos in preparation for today's deposition?
8        A   One document.
9        Q   What document is that?
10       A   Executive Order No. 11 from Mayor
11   Dinkins.
12           MS. DAINOW:  By Counsel, it was
13       provided to Mr. Ashanti yesterday.
14           MR. ASHANTI:  Okay.
15       Q   Why did you review that particular
16   document?
17       A   To familiarize myself with the
18   terms of the document.
19       Q   What was your basis for
20   determining that that document to potentially
21   have relevance to this deposition?
22       A   Reporting requirements.
23       Q   Did you review any videos in
24   preparation for today's deposition?
25       A   No.

18

T. Europe

1
2    name other than Theresa Europe?
3        A   I'm married.  My last name is
4    Jenkins.
5        Q   So your married name is Europe.
6    Your maiden name is --
7        A   No.
8        Q   The other way around?
9        A   My maiden name is Europe which I'm
10   known professionally.  My married name is
11   Jenkins.  Prior to that my previous marriage
12   was Kwabi, K-W-A-B-I.
13       Q   In terms of any official
14   documentation, do you always use the name
15   Theresa Europe, or do you sometime use Theresa
16   Jenkins, something else?
17       A   Always Europe.
18       Q   Is that just in your professional
19   capacity or do you also use Europe for like,
20   say, taxes?
21       A   Europe for taxes.
22           MS. DAINOW:  Just note my
23       objection to the last question, please.
24           MR. ASHANTI:  Right.
25       Q   Do you use the name Jenkins,

20

5 (Pages 17 to 20)

T. Europe

1    Theresa Jenkins for any official purposes like
2    a driver's license?
3         MS. DAINOW:  Objection.
4         You can answer.
5    A    None.
6    Q    So not even a driver's license?
7    A    I got married last month.  So
8    nothing yet.
9    Q    Understood.  I'm assuming the
10   answer is no, but do you ever use the name
11   Theresa Kwabi for any purposes?
12   A    Kwabi is actually on my driver's
13   license.  Can you imagine how my present
14   husband loves that?
15   Q    Yeah, I get that.
16        What is the highest level of
17   education you've completed?
18   A    J.D.
19   Q    Where did you obtain your J.D.?
20   A    St. John's School of Law.
21   Q    Prior to attending St. John's, did
22   you obtain an undergraduate degree?
23   A    I did.
24   Q    Where did you obtain that?

21

T. Europe

1    time?
2    A    Kings County District Attorney's
3    office.
4    Q    When did you work there?
5    A    1994.
6    Q    Until when?
7    A    January 1998.
8    Q    When did you start working with
9    the New York City Department of Education?
10   A    January 1998 as well.
11   Q    Did you ever serve in the
12   military?
13   A    I did not.
14   Q    My understanding you're currently
15   employed with the New York City Department of
16   Education; is that correct?
17   A    Correct.
18   Q    What is your current title there?
19   A    Executive Director, Office of
20   Human Trafficking Awareness and Prevention.
21   Q    While you worked with the New York
22   Kings County DA's office, in what bureaus did
23   you work?
24   A    I worked in Early Case Assessment.

23

T. Europe

1    A    SUNY Old Westbury.
2    Q    When was it that you obtained your
3    J.D. from St. John's?
4    A    1994.
5    Q    When was it you obtained your
6    undergraduate degree?
7    A    1987, I believe.  I didn't go
8    straight to law school.
9    Q    Does your current role with the
10   New York City Department of Education require
11   you to engage in the practice of law?
12   A    My current role, no.
13   Q    Prior to your current role, did
14   you have any role with the New York City
15   Department of Education where you practiced
16   law?
17   A    Yes.
18   Q    We'll get to that in a minute.
19        Did you ever practice law after
20   obtaining your J.D. from St. John's but before
21   becoming a New York City Department of
22   Education employee?
23   A    Yes, I did.
24   Q    Where did you practice law at that

22

T. Europe

1    I worked in Domestic Violence.  I worked in Sex
2    Crimes Against Children, and I been in the Gray
3    Zone.
4    Q    What's the Gray Zone?
5    A    It's a felony trial division.
6    Q    Did you ever prosecute sex crimes
7    against children?
8    A    Are you saying was I the attorney?
9    Q    Right, exactly.  Were you ever the
10   lead counsel in a felony sex crime prosecution?
11   A    No, I was not.
12   Q    How long did you work in the Sex
13   Crimes Against Children Bureau?
14   A    Maybe a little over a year.
15   Q    I think you mentioned you worked
16   in the domestic violence?
17   A    Yes.
18   Q    What's that unit called?
19   A    Domestic Violence Unit.
20   Q    It's not special victims or is
21   that separate?  Or maybe I'm watching too much
22   Law and Order?
23   A    You're seeing too much Law and
24   Order.

24

6  (Pages 21 to 24)

T. Europe

1    Q   So no SVU?
2    A   There is actually, but it's not in
3  the district attorney's office.  It's with the
4  police department.
5    Q   How long did you work in the
6  Domestic Violence Unit?
7    A   I'd say about six months.
8    Q   So let's work chronologically from
9  January 1998 as quickly as we can.  What was
10 your first role with the New York City
11 Department of Education?
12   A   Early Case Assessment Bureau.
13   Q   What did that role entail?
14   MS. DAINOW:  I'm sorry to
15   interrupt.  Just to clarify, you're
16   asking her first role with DOE or with
17   the Kings County District Attorney's
18   office?
19   MR. ASHANTI:  DOE.
20   A   I'm sorry, I misunderstood that.
21   Q   Sure.  January 1998 you began your
22 employment with the New York City Department of
23 Education, correct?
24   A   Correct.

25

T. Europe

1  of Administrative Trial Unit ended, did you
2  assume a new role with the New York City
3  Department of Education?
4    A   I did.
5    Q   What was that new role?
6    A   Director of the Office of Case
7  Assessment and Review.
8    Q   What did your role as Director of
9  Office of Case Assessment and Review entail?
10   A   Going out to schools, assisting
11 with school-based investigations.
12   Q   What kind of investigations?
13   A   School based.  So they're usually
14 corporal punishment over verbal abuse where the
15 principal had an excess of certain number of
16 cases open, either myself or one of my staff
17 members would go out to the school to assist
18 them.
19   Q   During that period of time, did
20 you ever investigate any allegations of
21 attempted or completed sexual assault against a
22 student?
23   A   No, we don't handle those.
24   Q   So until when did you have the

27

T. Europe

1    Q   So what was your first role with
2  the DOE?
3    A   I was a staff attorney in the
4  Administrative Trials Unit.
5    Q   For how long did you have that
6  role?  Until when?
7    A   11 months.  November of that same
8  year.
9    Q   Have you had continuous employment
10 with the New York City Department of Education
11 from 1998 until the present?
12   A   Yes, I have.
13   Q   So in November of 1998, did you
14 change roles with the New York City Department
15 of Education?
16   A   Yes.
17   Q   What was your new role at that
18 point?
19   A   I became the Director of the
20 Administrative Trials Unit.
21   Q   Until when did you serve in that
22 capacity?
23   A   From 1998 to 2012.
24   Q   In 2012 when your role as Director

26

T. Europe

1  role as Director of Office of Case Assessment?
2    A   Until my most recent which is
3  September of 2022, I became Executive Director
4  of the Office of Human Trafficking Awareness
5  and Prevention.
6    Q   Is that a position that you sought
7  or were you recruited, something else?
8    A   I sought it.
9    Q   Why is that?
10   A   Something I have interest in.  I
11 actually retired or at least put in my papers
12 to retire.  My retirement date hadn't come up
13 yet and the new chancellor asked me to stay.
14 And I agreed to stay if I could create this
15 office.
16   Q   So before you assumed your current
17 role, the office did not exist; is that fair?
18   A   That's correct.
19   Q   And how was it you went about
20 assembling a team or staff for that office?
21   MS. DAINOW:  Objection.
22   You can answer.
23   A   I'm actually still assembling a
24 team.  But recruiting out of district

28

T. Europe

1  attorney's offices is where I intend to go.
2      Q   And that office, your current work
3  role, you worked out of 52 Chambers Street?
4      A   That is the main location for the
5  Department of Education.  My actual office is
6  at 100 Gold Street, also in Manhattan.
7      Q   What is the current number of
8  staff for your office?
9      A   There's four of us.
10      Q   Is there a target goal in terms of
11  when you would consider it a full staff in
12  terms of number of people?
13      A   No, there's not a targeted goal.
14  But currently, I'm looking to hire three
15  people.
16      Q   So when in 2022, did you assume
17  that role?
18      A   September.
19      Q   Is your office an investigative
20  body?
21      A   No, it is not.
22      Q   Does your office work with any
23  investigative bodies within New York City
24  Department of Investigation?

29

T. Europe

1  stakeholders on a regular basis.
2      Q   Has your office created or
3  directed the creation for any materials that
4  would provide awareness of the issue of human
5  trafficking within the DOE?
6      A   Not as of yet.
7      Q   Is that something that your office
8  intends to do?
9      A   Yes.
10      MS. DAINOW:  Objection.
11      Q   I'd like to now introduce the
12  Executive Order Number 11 that you mentioned
13  which has previously marked for identification
14  as Plaintiff's Exhibit 1.
15      Can you see Executive Order Number
16  11 on your screen?
17      A   I can, yes.
18      Q   So, Ms. Europe, is this the
19  executive order that you referred to?
20      A   Yes, it is.
21      Q   On the first page of this
22  document, I'll just read the portion of
23  sentence in only the first main paragraph.
24  "This executive order requires the Commissioner

31

T. Europe

1      A   Yes.
2      Q   Is there a plan for the future for
3  your office to have investigation or
4  enforcement authority?
5      A   No.
6      Q   What's the purpose or the mission
7  of your office?
8      A   To provide students with the tools
9  necessary to spot somebody who might be
10  recruiting them for the purposes of human
11  trafficking.  Provide educators the same tools
12  to share with their students.
13      Q   Is that recruiting you're talking
14  about, is that what is also sometimes referred
15  to as "grooming"?
16      A   Yes.
17      Q   In your capacity in your current
18  role, is there any continuing legal education
19  or any educational resources that you tap into
20  or lean upon, you know, as you in your role as
21  executive director of that office?
22      MS. DAINOW:  Objection.
23      You can answer.
24      A   I seek training with external

30

T. Europe

1  of Investigation to appoint a Deputy
2  Commissioner of Investigation for the City's
3  School District of City of New York Deputy
4  Commissioner who will be independent from the
5  Board of Education, and who will be responsible
6  for the investigation of corruption, conflicts
7  of interest, unethical conduct and other
8  misconduct within the school district of City
9  of New York."  Do you see that?
10      A   I do.
11      Q   So this document was -- well, it
12  has a date on the first page toward the top of
13  June 28, 1990; is that correct?
14      A   Yes.
15      Q   Is it your understanding that this
16  Executive Order No. 11 was issued in June of
17  1990?
18      A   Yes.
19      Q   Is there a sequential order to
20  these kinds of executive orders where one
21  replaces the other?  Meaning does Executive
22  Order No. 12 replace Executive Order No. 11?
23      MS. DAINOW:  Objection.
24      You can answer.

32

8  (Pages 29 to 32)

T. Europe

1                   T. Europe
2          A   I have no idea.
3          Q   Is this Executive Order No. 11
4    still operative within the DOE today?
5               MS. DAINOW:  Objection.
6          You can answer.
7          A   Yes, it is.
8          Q   Has it been continuously operative
9    from its issuance in June of 1990 until present
10   day?
11              MS. DAINOW:  Objection.
12         You can answer.
13         A   Yes.
14         Q   As far as you know, does the DOE
15   still have a Deputy Commissioner of
16   Investigation?
17         A   No, that title was changed to
18   Commissioner.  Special Commissioner, to be
19   exact.
20         Q   When did that change occur?
21              MS. DAINOW:  Objection.
22         You can answer.
23         A   1992.
24         Q   So just for ease of reference when
25   I'm referring to Deputy Commissioner of

33

T. Europe

1                   T. Europe
2          You can answer.
3          A   Well, as the order says, to
4    provide investigations on an independent basis.
5          Q   So prior to this Executive Order
6    No. 11, investigations were conducted in-house?
7               MS. DAINOW:  Objection.
8          You can answer.
9          A   I don't know who was conducting
10   the investigations prior to the creation of
11   this office.
12         Q   Has the DCI or SCI ever launched
13   an investigation into conduct of any DOE
14   employee who worked at IS-237 during the
15   1998-1999 school year?
16              MS. DAINOW:  Objection.  I'll
17   instruct the witness not to answer.
18         First off, it's an objectionable
19   question in and of itself because she
20   has no reason to know and you haven't
21   laid a foundation for same.  But also
22   you're asking about claims that have
23   been dismissed from this case.
24         So please move on, Counselor.
25         MR. ASHANTI:  This was ruled on by

35

T. Europe

1                   T. Europe
2    Investigation, I might refer to that position
3    as DCI; is that fair?
4          A   Well, the acronym is actually SCI.
5          Q   Okay.  Well, for purposes of this
6    document, though, there are several references,
7    or I might reference this particular document,
8    Plaintiff's Exhibit 1, which as you stated
9    predates the change to Special Commissioner of
10   Investigation.  So if I use the term "DCI,"
11   you'll know that I'm referring to the Deputy
12   Commissioner of Investigation otherwise known
13   as the Special Commissioner of Investigation
14   otherwise known as SCI; is that fair?
15         A   Okay.
16         Q   Is it your understanding that this
17   position of Deputy Commissioner or Special
18   Commissioner has been, you know, in effect,
19   meaning someone has held that position
20   continuously from 1990 to the present day?
21         A   Yes.
22         Q   Why was the position of Deputy
23   Commissioner of Investigation created in the
24   first place?
25              MS. DAINOW:  Objection.

34

T. Europe

1                   T. Europe
2    Judge Levy yesterday.  It's fair game.
3          MS. DAINOW:  It was ruled on.  He
4    specifically said you can't.
5          MR. ASHANTI:  He did not.  Judge
6    Levy did not exclude the year '98 to
7    '99.  Is that your contention?
8          MS. DAINOW:  My contention is
9    exactly what Levy said which is you
10   can't ask about claims dismissed.  And
11   claims regarding 1998 and IS-237 have
12   been dismissed from this case.
13         MR. ASHANTI:  Okay, we have to
14   call the court.
15         MS. DAINOW:  Okay, please put it
16   on speakerphone.
17         (Whereupon, a brief recess was
18   taken.)
19         MR. ASHANTI:  So we will table
20   that question.
21         Q   As far as you know, has New York
22   City Department of Education ever launched an
23   investigation into the conduct of any DOE
24   employee who worked at Francis Lewis High
25   School between the years of 1999-2002?

36

T. Europe

1   A   I would not know.
2   Q   Have you ever heard the name of
3   L.C.?
4       MS. DAINOW:  I'll object and put
5   on the record that any conversations
6   between the witness and counsel are
7   privileged.
8       MR. ASHANTI:  I'm not asking about
9   any conversations.  I'm asking a simple
10  question.
11  Q   Have you ever heard the name L.C.?
12  A   I have not.
13  Q   Have you ever the heard name L.N.?
14  A   I have not.  Not to my
15  recollection.
16  Q   Did you review the New York City
17  Department of Education student file for a
18  student by the name of L.C. in preparation for
19  today's deposition?
20  A   No.
21  Q   Did anyone show you her student
22  file?
23  A   Nope.
24  Q   Have you ever heard the name

37

T. Europe

1   Mark Waltzer?
2   A   No.
3   Q   Have you ever heard the name
4   Douglas Meiners?
5   A   No.
6   Q   Have you ever heard the name
7   Michael Eisenberg?
8   A   I don't believe so.
9   Q   So is it that you've heard the
10  name but you don't think that it relates to
11  your --
12      MS. DAINOW:  Objection.
13  Q   Again, please let me finish before
14  you answer.  Is it that you've heard the name but
15  you are not sure if it fits within the context
16  of your employment with the DOE or something
17  else?
18      MS. DAINOW:  Objection.
19      You can answer.
20  A   I've heard the name Eisenberg.  I
21  don't know if it's within my employment or
22  personally.  It's a very common name.
23  Q   Have you ever heard the name
24  Michael Eisenberg as it relates to a former New

38

T. Europe

1   York City Department of Education teacher?
2   A   Not that I recall.
3   Q   Have you ever heard the name Roger
4   Sarmuksnis?
5   A   No.
6   Q   Have you ever heard the name
7   Christopher Power?
8   A   No.
9   Q   So back to the exhibit.  Go to
10  paragraph 3 E.  If you look at your screen
11  towards the bottom do you see paragraph E?
12  A   I can see it.
13  Q   This paragraph reads, "The Deputy
14  Commissioner shall, at the conclusion of any
15  investigation that results in a written report
16  or statement of findings, provide a copy of the
17  report or statement to the Commissioner of
18  Investigation, Chancellor, and the Board of
19  Education."  Was that a fair reading?
20  A   Yes.
21  Q   Where are the investigation
22  reports referred to in this paragraph stored by
23  DOE?
24      MS. DAINOW:  Objection.

39

T. Europe

1   You can answer.
2   A   Where were they stored?
3   Q   Yeah, where are they stored, the
4   investigation reports.  Either DCI or SCI?
5       MS. DAINOW:  I'll maintain my
6   objection.
7       You can answer.
8   A   In the Office of the General
9   Counsel.
10  Q   If we look at the very next
11  paragraph, this is paragraph F, bottom of page
12  3 of Plaintiff's Exhibit 1 which is Executive
13  Order No. 11.  The first sentence of that
14  paragraph reads, "The Deputy Commissioner shall
15  make an annual report of his or her findings
16  and recommendations to the Commissioner of
17  Investigation, the Board of Education and the
18  Chancellor"; is that a fair reading?
19  A   Yes.
20  Q   Where are the annual reports when
21  referred to in paragraph 3 F stored by DOE?
22      MS. DAINOW:  Objection.
23      You can answer.
24  A   I don't know where they are

40

T. Europe

1  stored.
2      MR. ASHANTI:  I call for
3  production of annual reports of New York
4  City Department of Education as issued
5  by the Deputy Commissioner of
6  Investigation for the years 1998-2002.
7      MS. DAINOW:  Please put your
8  request in writing.  I'll respond
9  accordingly.
10      MR. ASHANTI:  Also call for
11  production of investigation reports
12  issued by the Deputy Commissioner of
13  Investigation for the years 1998-2002 as
14  stored by the Office of the General
15  Counsel of the Department of Education.
16      MS. DAINOW:  Again, please put
17  your request in writing.  I'll respond
18  accordingly.
19      Q   If we could look at Plaintiff's
20  Exhibit 2 for a moment.  Just for the record
21  this is a letter addressed to Mark Waltzer
22  dated May 13, 2002 with the official Board of
23  Education of City of New York letterhead at the
24  top.

41

T. Europe

1      Ms. Europe, have you ever seen
2  this document before?
3      A   Not that I recall.
4      Q   Did anyone one show you this
5  document?
6      A   No.
7      Q   Can you please just take a moment
8  to review it and let me know after you have
9  done so.
10      A   I see it.  Okay.
11      Q   Having read this document, can you
12  please tell me what is your understanding of
13  the Ineligible/Inquiry List referred to in
14  Plaintiff's Exhibit 2?
15      MS. DAINOW:  Objection.
16      You can answer.
17      A   It's an inquiry list when you get
18  put on there, you cannot apply for any transfer
19  from your school or, you know, extracurricular
20  activities.
21      Q   Extracurricular activity such as?
22      A   I'm going to back that up.  I'm
23  using the wrong -- per session is what I'm
24  trying to say.  You cannot apply for any per

42

T. Europe

1  session work as a teacher.
2      Q   What's per session work?
3      A   These are extracurricular things
4  that a teacher might do.  Their jobs outside of
5  their current responsibilities in a way for a
6  teacher to make a little extra money.  Per
7  session activities.
8      Q   Is the prohibition against the per
9  session work or transfers in order to prevent a
10  New York City Department of Education employee
11  from having interactions with DOE students
12  while they're on this list?
13      MS. DAINOW:  Objection.
14      You can answer.
15      A   Possibly.  You would also get a
16  reassignment letter if we did not want you to
17  have contact with students.
18      Q   What is it that precipitates
19  someone being placed on this Ineligible/Inquiry
20  List?
21      MS. DAINOW:  Objection.
22      You can answer.
23      A   Could be a number of things.  Like
24  this letter shows, it could be as a result of

43

T. Europe

1  an arrest.  It could be a result of an
2  investigation.
3      Q   An investigation into what kinds
4  of conduct?
5      A   It could be sexual misconduct.  It
6  could be corporal punishment.  Anything where
7  you are considered where it's considered it's
8  not appropriate for the individual to be in the
9  presence of students.
10      Q   Understood.
11      In this particular instance as you
12  alluded to the placement of Mr. Mark Walter on
13  the Ineligible/Inquiry List was precipitated by
14  an arrest; is that correct?
15      MS. DAINOW:  Objection.
16      You can answer.
17      A   That's what it says.
18      Q   It also indicates above the word
19  "Arrest" on this document, Office of Personnel
20  Investigations.  Do you see that?
21      A   I do.
22      Q   Is that an investigative body of
23  SCI or DCI or something else?
24      MS. DAINOW:  Objection.

44

11  (Pages 41 to 44)

T. Europe

1
2         You can answer.
3     A   No.
4     Q   What's your understanding of what
5 Office of Personnel Investigations is?
6     A   Under the HR umbrella for the
7 Department of Education.
8     Q   What kind of investigations does
9 that office conduct?
10        MS. DAINOW:  Objection.
11        You can answer.
12    A   I don't know what they conduct.  I
13 just know that they handle issues concerning
14 arrests.
15    Q   Is it also referred to as OPI?
16        MS. DAINOW:  Objection.
17        You can answer.
18    A   Yes, it is.
19    Q   Where are the investigations of
20 the files of the OPI stored?
21        MS. DAINOW:  Objection.
22        You can answer.
23    A   I don't know.
24    Q   This letter indicates that it was
25 cc'd to the Special Commissioner of

45

T. Europe

1 Investigations.  Do you see that?
2     A   I do.
3     Q   You previously testified basically
4 that is the same position as the Deputy
5 Commissioner of Investigation.  Just there was
6 a name change; is that correct?
7         MS. DAINOW:  Objection.
8         You can answer.
9     A   Correct.
10    Q   Is the fact that there is a cc'd
11 to the Special Commissioner of Investigation,
12 is that an indication that the Special
13 Commissioner of Investigation has either a
14 pending or intends to conduct an investigation
15 as well?
16        MS. DAINOW:  Objection.
17        You can answer.
18    A   No.
19    Q   What would be the purpose of the
20 cc to the Special Commissioner of Investigation
21 here?
22        MS. DAINOW:  Objection.
23        You can answer.
24    A   To let them know an employee has

46

T. Europe

1 been arrested.
2     Q   What, if anything, would the SCI
3 do with that investigation?
4         MS. DAINOW:  Objection.
5         You can answer.
6     A   I wouldn't know.
7     Q   In any of the capacities that you
8 worked for the New York City Department of
9 Education, have you ever worked with or in a
10 professional capacity with the Special
11 Commissioner of Investigation?
12    A   Yes.
13    Q   Is an arrest of a teacher
14 something that the Special Commissioner of
15 Investigation would investigate?
16        MS. DAINOW:  To her knowledge, is
17        that the question?
18        MR. ASHANTI:  Everything is to her
19        knowledge.
20        MS. DAINOW:  Okay, you can answer.
21    A   Possibly.  They don't investigate
22 every arrest.
23    Q   Well, how would they differentiate
24 between the ones that they do and do not

47

T. Europe

1 investigate?
2         MS. DAINOW:  Objection.
3         You can answer.
4     A   That would be up to them.
5     Q   Is there any protocols or rules
6 that are in place as to what arrests they would
7 should or should not investigate?
8         MS. DAINOW:  Objection.
9         You can answer.
10    A   Not through Department of Ed, but
11 maybe through their office.  I wouldn't know.
12    Q   So in other words, in terms of the
13 DOE's umbrella for it's various departments,
14 the Special Commissioner of Investigation does
15 not fall within DOE umbrella?
16        MS. DAINOW:  Objection.
17        You can answer.
18    A   That's correct.  They don't work
19 for us.
20    Q   Did the New York City Department
21 of Education have any measures in place,
22 measures or policy in place between 1998-2002
23 to prevent sexual assault by students?
24        MS. DAINOW:  Objection.  I'm

48

T. Europe

1  instructing the witness to only answer
2  the question from 1999-2002.
3       Q   You can answer it.
4       MS. DAINOW:  To her knowledge.
5       A   Repeat the question.
6       MR. ASHANTI:  Everything is to her
7  knowledge.
8       Q   I'll make a blanket statement.
9  All questions I ask you from now until the
10  conclusion of the deposition are to your
11  knowledge.  As I instructed you at the very
12  beginning of the deposition, if there's any
13  question you don't know the answer to, it's
14  perfectly fine to say you do not know.  Is that
15  the understanding that you have, Ms. Europe?
16       A   Yes.
17       Q   Great.  So we can proceed.
18       MR. ASHANTI:  If you could please
19  have the question record back.
20       (Record read.)
21       MS. DAINOW:  Again, I'll instruct
22  the witness only to answer from
23  1999-2002.
24       A   We can't prevent sexual assaults.
25

49

T. Europe

1  But what we can do is institute reporting
2  requirements when there has been allegations of
3  a sexual assault.
4       Q   Well, we'll get back to the
5  question I asked you.  But I just wanted to
6  clarify something for that purpose and moving
7  forward.  Your office actually has "awareness"
8  in its title, correct?
9       MS. DAINOW:  Objection you.
10       Can answer if you understand.
11       A   My current title, yes.
12       Q   Can you repeat the title of your
13  office again?
14       A   Office of Human Trafficking
15  Awareness and Prevention.
16       Q   So is it fair to say that there
17  are certain measures that your office or any
18  office can undertake that can potentially raise
19  awareness and therefore in certain instances
20  prevent sexual assault?
21       MS. DAINOW:  Objection.
22       You can answer.
23       A   We can raise awareness.  But
24  because we're dealing with individuals who work
25

50

T. Europe

1  on their own free will, we cannot prevent.
2  That's like saying you can prevent crime from
3  happening.
4       Q   Well, there are actually -- for
5  instance, the NYPD does take measures such as,
6  you know, having a certain number of officers
7  on certain blocks or whatever and it does
8  actually state that does prevent crime, right?
9       MS. DAINOW:  Objection.
10       MR. ASHANTI:  Hold on.  Excuse me.
11  I'm not finished.
12       Q   So my question to you is, do you
13  believe in the instance I referred to NYPD
14  that's for purposes of deterrence.  Do you
15  believe that awareness is something that
16  amongst students, amongst teachers if there's
17  full and 100 percent complete awareness of
18  issues relating to grooming and sexual assault,
19  that that could act as a deterrent for sexual
20  assault in schools?
21       MS. DAINOW:  Hold on.  I need the
22  question read back.  It was way too
23  convoluted.  I need to hear it again
24  please.
25

51

T. Europe

1       (Record read.)
2       MS. DAINOW:  Objection.
3       You can answer.
4       A   We provide awareness, training to
5  students, to administrators for the purpose of
6  deterring such conduct.  But we cannot prevent
7  the conduct from actually occurring.  We can
8  only take action if it, in fact, does occur.
9       Q   I think there's kind of semantical
10  differences.  I'll move on.
11       I'll use the term "deterrence"
12  then.  So did the New York City Department of
13  Education have any policies or measures in
14  place from 1998-2002 in order to deter sexual
15  assault in schools?
16       MS. DAINOW:  Objection.
17       I'm going to instruct the witness
18  to only answer the question from
19  1999-2002.
20       You can answer.
21       A   No.
22       MR. ASHANTI:  This is the court.
23  Let's go off the record.
24       (Discussion is held off the
25

52

13  (Pages 49 to 52)

T. Europe

1    record.)
2    Q    Ms. Europe, we retained a ruling
3    from the court. You actually have to answer
4    the following question and line of questioning
5    as it relates to 1998-1999 school year.
6    Starting with this: Has the DCI or SCI ever
7    launched an investigation into the conduct of a
8    DOE employee who worked at IS-237 during the
9    1998-1999 school year?
10          MS. DAINOW: Objection.
11          You can answer.
12    A    I wouldn't know.
13    Q    Who would know?
14    A    SCI would know.
15    Q    The SCI, is that an individual or
16    an office?
17    A    It's an office.
18    Q    Is there a person that's known as
19    the SCI or no?
20    A    The Special Commissioner?
21    Q    Yes.
22    A    There is a commissioner of that
23    office, yes.
24    Q    Who is that currently?

53

---

T. Europe

1    A    I don't know her last name, but
2    her first name is Anastasia.
3          MS. DAINOW: Note my objection to
4    the last question, please.
5          MR. ASHANTI: Karen, read back my
6    prior question after we got the ruling.
7          (Record read.)
8    Q    Would your answer also apply to
9    the 1998-1999 school year, Ms. Europe?
10          MS. DAINOW: Objection.
11          You can answer.
12    A    I'll correct the entire answer and
13    change it from "no" to "I don't know." The
14    union would handle the training of their staff.
15    Q    What union are you referring to?
16    A    The United Federation of Teachers.
17    Q    So does the United Federation of
18    Teachers set DOE policies?
19          MS. DAINOW: Objection.
20          You can answer.
21    A    They negotiate with Department of
22    Education concerning certain policies, yes.
23    Q    I'm not talking about consulting.
24    I'm talking about does the United Federation of

54

---

T. Europe

1    Teachers issue DOE policies?
2          MS. DAINOW: Objection.
3          You can answer.
4    A    Issue policies, no.
5    Q    So my question does not relate to
6    the United Federation of Teachers. It relates
7    only to the New York City Department of
8    Education. I'll repeat it.
9          Did the New York City Department
10    of Education have any policies or measures in
11    place for the years 1998-2002 to prevent sexual
12    assault of students?
13          MS. DAINOW: Objection.
14          You can answer.
15    A    Same answer. I wouldn't know.
16    Q    Then why did you say no before?
17    A    I misunderstood your question.
18    Q    But you didn't say you
19    misunderstood, did you?
20          MS. DAINOW: Karl, borderline
21    harassing the witness now. Just move
22    on.
23    A    My answer remains the same.
24    Q    Did you state at the time that you

55

---

T. Europe

1    misunderstood my question?
2    A    I did not.
3    Q    If you don't know, who would know?
4          MS. DAINOW: Objection.
5          Can you give a complete sentence?
6    I don't even know what you're talking
7    about.
8          MR. ASHANTI: Okay.
9    Q    The question is: Did New York
10    City Department of Education have any policies
11    in place from the years 1998-2002 to prevent
12    the sexual assault of students? And my
13    question based upon that predicate is: If you
14    don't know the answer to that question, who
15    would know?
16          MS. DAINOW: Objection.
17          You can answer.
18    A    I don't know.
19    Q    Does New York City Department of
20    Education have any policies in place currently
21    to prevent the sexual assaults of students?
22          MS. DAINOW: Objection.
23          You can answer.
24    A    So there are Chancellor's

56

---

14 (Pages 53 to 56)

T. Europe

```
 1                T. Europe
 2    Regulations that address safety of students.
 3        Q    Such as?
 4        A    Chancellor's Regulations.  I'm not
 5    familiar with every Chancellor's Regulation and
 6    the number.
 7        Q    I'm referring to the ones
 8    referring to this question regarding deterrence
 9    against sexual assault of students.
10        A    Again, there are Chancellor's
11    Regulation concerning safety of students which
12    all DOE employees are required to abide by.
13        Q    That refer specifically against
14    the deterrence of sexual assaults against
15    students?
16        A    I would have to read the
17    regulations to determine whether that is
18    specifically addressed.
19            But again, concerning the safety
20    of students which sexual assault would fall
21    into that category, there are chance sellers
22    regulations.
23            MS. DAINOW:  Note my objection to
24        last question, please.
25            Continue.
                                        57
```

T. Europe

```
 1                T. Europe
 2            MS. DAINOW:  Enough.  You're
 3    harassing the witness.
 4            MR. ASHANTI:  I am not harassing
 5    the witness.
 6            MS. DAINOW:  She has answered the
 7    question.  What more do you want?
 8            MR. ASHANTI:  She didn't answer
 9    the question.
10            MS. DAINOW:  So this is the last
11    question.  The same question variation
12    of ways I'll allow her to answer.
13            You can answer over my objection.
14            MR. ASHANTI:  Please have it read
15    back.
16            (Record read.)
17        Q    You can answer.
18        A    Same answer.  The safety of
19    students is in the Chancellor's Regulations.
20            MR. ASHANTI: Honestly, I might
21    have to -- we might have to ask for DOE
22    to produce another witness who would
23    have that kind of knowledge.
24            MS. DAINOW:  I would object to
25        that.  Put your request in writing.
                                        59
```

T. Europe

```
 1                T. Europe
 2        Q    Concerning whether there are
 3    Chancellor's Regulations that currently relate
 4    to the prevention or deterrence against sexual
 5    assault of students, you don't know; is that
 6    fair?
 7        A    My answer remains the same.
 8        Q    You haven't answered that.
 9        A    I did actually.
10        Q    Okay.
11        A    I have to check the Chancellor's
12    Regulations.
13        Q    Does that mean you don't know?
14            MS. DAINOW:  Objection.
15            She answered the question already.
16        Q    My question is:  Does that mean
17    you don't know?
18            MS. DAINOW:  Over my objection.
19            You can answer.
20        A    I'm sure it's in there but I
21    couldn't say which regulation.
22        Q    So as you sit here today, you're
23    not consciously aware of any one that
24    specifically relates to deterrence of sexual
25    assault?
                                        58
```

T. Europe

```
 1                T. Europe
 2        Q    For the years 1998-2002, did the
 3    DOE have any policies or measures in place for
 4    reporting of sexual assaults of students?
 5            MS. DAINOW:  Objection.
 6            You can answer.
 7        A    Yes.
 8        Q    What were those?
 9        A    Requirement to report any sexual
10    misconduct to the Office of the Special
11    Commissioner.
12        Q    Is that in Executive Order 11 or
13    somewhere else?
14        A    That's in the Executive Order No.
15    11.
16        Q    Do you have a physical copy with
17    you of Order Number 11?
18        A    I have it here.  I don't have it
19    sitting at this table with me.  But if you'd
20    like me to get it, I could.
21        Q    Yes, please.  It might be easier
22    because I'm going to ask you to identify where
23    that reporting requirement is listed within the
24    executive order.
25        A    Okay.  You know what?  As I'm
                                        60
```

T. Europe

1  sitting here thinking concerning your question
2  of the sexual misconduct, I believe it's
3  Chancellor's Regulation A831.  But I would have
4  to review it.  But there is -- I know there's a
5  regulation as I stated before and I believe
6  it's under A831.
7      Q   So A as in apple?
8      A   Yes.  Let me get the document.
9  Excuse me?
10     Q   Sure.
11         (Whereupon, a brief pause in the
12  record was taken.)
13     A   Am I supposed to be doing
14  something?
15     Q   Executive Order No. 11 that
16  relates to the reporting requirements?
17     A   Oh, give me a second.  Sorry about
18  that.  I was waiting for the question, but you
19  did say that.
20         So it's under Section 4,
21  Cooperation with the Deputy Commissioner of
22  Investigation for the City School District.
23     Q   Which paragraph of section 4?
24     A   So right now I'm looking at B, the

61

T. Europe

1  Board of Education, the Chancellor, all
2  Community School Boards and Community
3  Superintendents within the School District of
4  the City of New York, and all other heads of
5  departments or agencies of the City shall
6  insure the full cooperation of all persons
7  employed or supervised by them with
8  investigation or inquiry conducted by Deputy
9  Commissioner."  That's under B.
10     Q   But is it fair to say that that
11  particular paragraph, paragraph B does not
12  mention reporting?
13     A   It does not mention reporting.  It
14  mentions cooperation.  But give me a second.
15  I'm looking at the other provision.
16         MS. DAINOW:  Note my objection to
17  the last question.
18     A   So if you go down to subsection F.
19  Would you like me to read it?
20     Q   Yes.
21     A   "Every officer and employee of the
22  City School District of the City of New York,
23  including the members of the Board of
24  Education, the Chancellor, all Community School

62

T. Europe

1  Boards and Community Superintendents, and all
2  other officers and employees of the City shall
3  have the affirmative obligation to report,
4  directly and without undue delay, to the Deputy
5  Commissioner, any and all information
6  concerning conduct which they know or should
7  reasonably know may involve corruption or other
8  criminal activity or conflict of interest."  Do
9  I need to go further?
10     Q   No, that's fine.
11         It's your understanding that
12  paragraph subsumes the reporting of sexual
13  assaults?
14     A   Yes.
15     Q   Are there any other policies or
16  regulations which you're aware that were in
17  place between the years of 1998-2002 that
18  relates specifically to sexual assaults?
19         MS. DAINOW:  Objection.
20         You can answer.
21     A   I would refer you back again to
22  Chancellor's Regulation A831.
23     Q   Is it your understanding that
24  Chancellor's Regulation A831 was in place

63

T. Europe

1  during those years, 1998-2002?
2         MS. DAINOW:  Objection.
3         You can answer.
4     A   To my knowledge, yes.
5     Q   During those years 1998-2002, did
6  the DOE have any policies or measures in place
7  specifically designed to deter the sexual
8  assault of female students?
9         MS. DAINOW:  Objection.
10        I mean I'm going to object based
11  on Judge Levy's order, but I'll allow
12  the question for now and we'll continue
13  to see the questions that -- continue to
14  see if I'll allow the witness to answer.
15        You can answer over my objection.
16        MR. ASHANTI:  Read back.
17        (Record read.)
18     A   Specifically female students?
19     Q   Correct.
20     A   No, just sexual assault concerning
21  any student whether male or female.  We care
22  about all of them.
23     Q   Well, of course you care about all
24  of them.  But my question was:  Were there any

64

T. Europe

1    that were designed to prevent based upon the
2    specific risk that female students face sexual
3    assaults against them?
4         MS. DAINOW: Objection.
5         Over my objection you can answer.
6    A   No.
7    Q   So what were the policies that
8    were in place that were designed to deter
9    sexual assault of any student?
10   A   Again, I refer you to Chancellor's
11   Regulation A831, the reporting requirements
12   concerning the Special Commissioner's Office.
13   We also should look down to subsection G of
14   section 4 as well.
15   Q   Let's do that. Which portion of
16   that section do you believe relates to the
17   question?
18   A   I'm talking about reporting.
19   Q   Reporting. No, no. I was
20   referring to deterrence.
21        So do you believe that any
22   provision within Executive Order 11 refers to
23   the deterrence of sexual assault?
24   A   I would have to let the document

65

T. Europe

1         MS. DAINOW: Objection.
2         You can answer.
3    A   Specifically female students? I
4    wouldn't know.
5    Q   You wouldn't know? Or no?
6         MS. DAINOW: Objection.
7    A   No, I said my answer.
8    Q   Were there any policies in place
9    by the DOE during the years 1998-2002 to ensure
10   that the educational opportunities for any
11   student was not hindered?
12        MS. DAINOW: Objection.
13        You can answer.
14   A   Again, I would refer you to
15   Chancellor's Regulations.
16   Q   Which one?
17   A   I don't know offhand.
18   Q   Is the answer yes? It's a yes or
19   no question. Were there any measures in place
20   -- because I mean I'm aware of the Chancellor's
21   Regulations. I can look at them. But you're
22   here to answer these questions.
23   A   I know why I'm here. Thank you.
24   Q   Right. So it's a yes or no

67

T. Europe

1    speaks for itself.
2    Q   Well, based upon your prior
3    reading.
4    A   It's a reporting document.
5    Q   Okay. In other words, no?
6         MS. DAINOW: Objection.
7         You can answer.
8    A   Correct.
9    Q   During the year 1998-2002, did DOE
10   have any policies or measures in place to
11   ensure the educational opportunities for female
12   students were not hindered?
13        MS. DAINOW: Objection.
14        You can answer.
15   A   Well, we don't want any students
16   educational opportunities to be hindered
17   whether male or female.
18   Q   That's not the question and that's
19   not an answer to the question.
20        Again, were there any policies or
21   measures in place by the DOE during the years
22   1998-2002 to ensure that the educational
23   opportunities for female students were not
24   hindered?

66

T. Europe

1    question. So rather than referring me
2    elsewhere, I would like for you to answer the
3    question.
4         Were there any measures in place
5    during the years 1998-2002 by the DOE to insure
6    that the educational opportunities for any
7    student was not hindered?
8         MS. DAINOW: Objection.
9         You can answer.
10   A   I would again refer you to the
11   Chancellor's Regulations. I wouldn't know
12   offhand which one.
13   Q   During the years 1998-2002 did the
14   DOE have any policies or measures in place to
15   insure that female students were not hindered
16   in their access to school facilities?
17        MS. DAINOW: Objection.
18        You can answer.
19   A   When you say "school facilities,"
20   actually are you referring to the building
21   itself? To the school building?
22   Q   Any facility. Any school
23   facility.
24   A   I'm not sure I understand what

68

17 (Pages 65 to 68)

T. Europe

```
 1                  T. Europe
 2    you're asking me.
 3        Q    Let's say that they were able to
 4    attend class without being pulled out by a
 5    teacher.
 6        MS. DAINOW:  Objection.
 7            You're going to have to rephrase
 8        the question because the explanation
 9        doesn't, in my estimation, conform with
10        the actual question.  So I don't even
11        understand what you're asking.
12        Q    So school facilities, I mean it's
13    part of the Human Rights Law of New York City
14    and New York State, and that would be the
15    school building itself and the activities of
16    the -- you know, any facilities that any
17    student would normally have access to, right.
18            So again I'll repeat the question.
19    Did the DOE have any measures or policies in
20    place to insure that female students were not
21    hindered in their access to school facilities
22    to the year 1998-2002?
23        MS. DAINOW:  Objection.
24            You can answer.
25        A    So the Department of Education
```

69

```
 1                  T. Europe
 2    does not deny any male or female student access
 3    to a fair and equitable education.  So I'm a
 4    little confused by the question.
 5        Q    The question is not about whether
 6    or not the DOE wants students to have access.
 7    The question is were there any policies to
 8    insure that occurred or measures during the
 9    years 1998-2002 to insure that female students
10    had access to school facilities?
11        MS. DAINOW:  Note my objection.
12            You can answer.
13        A    So again I'm going to refer you
14    back to Chancellor's Regulations.  But it
15    wouldn't specifically mention female students.
16    That, I'm sure of.
17        Q    So the answer is no; in other
18    words?
19        A    No, that's not what I said.
20        Q    Excuse me.
21        A    No.  Excuse me.
22        Q    One person can speak at a time,
23    ma'am.
24        A    I was still speaking.  See, here
25    we go again.  You're asking me to answer.  I'm
```

70

```
 1                  T. Europe
 2    attempting to fully answer the question and
 3    you're interrupting me.
 4        Q    You gave an answer.
 5        A    Let's treat each other with
 6    professionalism.
 7        Q    That's perfectly fine.  You had
 8    answered the question.  I thought you were
 9    finished with your answer and I was moving on
10    to another question.  If you have something to
11    add, please do so.
12        A    As I was stating, it wouldn't
13    specifically pertain to female students.  It
14    would pertain to all students.  And I would
15    refer you back to the Chancellor's Regulations
16    because all students are given access to a full
17    and fair equitable education.
18        Q    Okay.
19        A    Now I'm finished.
20        Q    What are the policies that were in
21    place for the years 1998-2002 to insure that
22    female students had access to school
23    facilities?
24        MS. DAINOW:  First of all,
25        objection.
```

71

```
 1                  T. Europe
 2            Second, she's answered this three
 3        times already.  Move on.
 4        MR. ASHANTI:  I'm asking about the
 5        policies that are in place.
 6        MS. DAINOW:  You did ask about
 7        policies.  She responded to refer you to
 8        the Chancellor's Regulations.
 9        MR. ASHANTI:  I'm asking what
10        Chancellor's Regulations she is
11        referring to.
12        Q    What Chancellor's Regulations were
13    you referring to, ma'am?
14        MS. DAINOW:  I'll allow her to
15        answer.
16        A    I don't know the specific number
17    but that would be addressed in the Chancellor's
18    Regulations.
19        Q    Is that from your past experience
20    of having read such regulations?
21        MS. DAINOW:  Objection.
22            You can answer.
23        A    I wouldn't say it from my past
24    experience of reading them because I haven't
25    read through every Chancellor's Regulations in
```

72

18 (Pages 69 to 72)

T. Europe

1  a while. But I am sure that anything
2  concerning access to a full and fair education
3  would be addressed in there.
4      Q   If you've never read it, how do
5  you know it doesn't exist?
6      A   I didn't say I haven't read it. I
7  said I didn't read it in years.
8          MS. DAINOW: Objection to the last
9  question. Please continue.
10     A   I didn't say I've never read the
11 Chancellor's Regulations.
12     Q   When was the last time that you
13 recall reading a policy within the Chancellor's
14 Regulations that relate to insuring that
15 students have access to school facilities?
16     A   I couldn't recall.
17     Q   But you're certain that it exists?
18     A   I believe it exists.
19     Q   Whatever those regulations are,
20 they do not relate specifically to female
21 students; is that fair?
22     A   That's fair. Students in general.
23     Q   So is it your understanding that
24 female students do not face specific risks of

73

T. Europe

1  being exposed to sexual assault that male
2  students may not?
3          MS. DAINOW: Objection.
4          You can answer.
5      A   I think that's a very antiquated
6  way of thinking. The fact is anybody could be
7  sexually abused.
8      Q   I never denied that. Of course,
9  anyone can be sexually abused. But my question
10 is: Are there certain risks that female
11 students face in terms of being subjected to
12 sexual assault especially by male teachers that
13 other students may not face?
14         MS. DAINOW: Objection. She's not
15         here for purpose to answer questions
16         that an expert witness --
17         MR. ASHANTI: Are you directing
18         her not to answer?
19         MS. DAINOW: I am not but I'm
20         noting for the record you're asking a
21         question that an expert in a different
22         field is more qualified to answer than
23         this witness.
24         However, over my objection she can

74

T. Europe

1  answer.
2      A   I wouldn't know.
3      Q   In terms of regulations that you
4  mentioned, are those concerning insuring that
5  students have access to school facilities, are
6  those regulations that are disseminated
7  throughout schools, or are they distributed to
8  NYC DOE teachers?
9          MS. DAINOW: Objection.
10         You can answer.
11     A   They are online.
12     Q   Are teachers required to review
13 them?
14         MS. DAINOW: Objection.
15         You can answer.
16     A   Yes, they are.
17     Q   When are they required to review
18 them, when they first begin their employment at
19 the beginning of every school year, something
20 else?
21         MS. DAINOW: Objection.
22         You can answer.
23     A   At the beginning of their
24 employment and then at the beginning of every

75

T. Europe

1  school year principals have meetings with their
2  staff and hand out certain -- they advise to
3  familiarize yourself with all the Chancellor's
4  regulations. And there are a handful of
5  specific regulations that come up all the time
6  and principals may hand those out as well.
7      Q   Do any of those specific
8  regulations you're referring to relate to
9  either the reporting or deterrence against
10 sexual assault?
11     A   A Chancellor's Regulation A831
12 would be one of those regulations that is
13 handed out.
14         Now, the caveat to that is each
15 principal is the captain of their own ship. We
16 do trainings. I've done several myself where I
17 advise on certain regulations that should be
18 handed out at the beginning of every school
19 year. A principal is free to accept or reject
20 my recommendations. But A831 is one of them.
21 C105, the duty to report an arrest is one of
22 them. A420 and A421, the corporal punishment
23 verbal abuse regulations are another. Some
24 principals may hand out more.

76

T. Europe

1    Q   Are principals required to hand
2  out regulations A831?
3          MS. DAINOW:  Objection.
4          You can answer.
5      A   Not required to hand it out.  But
6  the employee is required to familiarize him or
7  herself with all the Chancellor's Regulations
8  including A831.
9      Q   Was that the case in the year
10 1998-2002?
11     A   Absolutely.
12         MS. DAINOW:  Objection to that
13 question.  Go ahead.
14     Q   Were there any DOE policies in
15 place for the years 1998-2002 for the reporting
16 of attempted or completed sexual assaults
17 against female students besides Chancellor's
18 Regulation A831 or Executive Order No. 11?
19         MS. DAINOW:  Objection.
20         You can answer.
21     A   There may be other regulations
22 that could address such conduct, but I will
23 refer to you A831.
24     Q   Are you aware of any others

77

T. Europe

1  measures in place for the years 1998-2002 to
2  ensure that students knew how to report
3  attempted or completed sexual assaults --
4          MS. DAINOW:  Objection.
5          You can answer.
6      Q   -- against them?
7          MS. DAINOW:  Objection.
8          You can answer.
9      A   I'm just thinking.
10     Q   Take your time.
11     A   So there's a -- I'm going to say
12 I'm not sure.
13     Q   Are you aware of any current
14 policies regarding that?
15         MS. DAINOW:  Objection.
16         You can answer.
17     A   So principals again share with
18 their students if there are any allegations of
19 abuse of any sort that they should report to
20 their teacher, guidance counselor, principal,
21 whoever they're comfortable with reporting to.
22     Q   Is that contained within any
23 Chancellor's Regulations or any other NYC DOE
24 policy?

79

T. Europe

1  specifically as you sit here today?
2          MS. DAINOW:  Objection.
3          You can answer.
4      A   Not that I can recall.
5      Q   For the years 1998-2002 were there
6  any other written materials that would have
7  been disseminated by principals that relate to
8  the reporting or deterrence against sexual
9  assaults of students?
10         MS. DAINOW:  Objection.
11         You can answer.
12     A   Again, each principal is, like I
13 said, kind of the captain of their own ship.
14 Certain principals may hand out more than
15 others.  But these are all addressed in the
16 Chancellor's Regulations.
17     Q   Are you aware of what the practice
18 of the principal of Francis Lewis High School
19 was concerning that for the year 1998-2002?
20         MS. DAINOW:  Objection.
21         You can answer.
22     A   Don't even know who the principal
23 was back then.  So the answer is no.
24     Q   Were there any policies or

78

T. Europe

1      A   Not that I'm aware of.
2      Q   How do you know that principals
3  know that?
4      A   Because I do trainings with
5  principals or did on a regular basis concerning
6  these things.  Not just these things.  Several
7  things concerning just things that they should
8  know.
9      Q   For the years 1998-2002 did the
10 principal at Francis Lewis High School have a
11 practice of informing students as to how to
12 report sexual assaults against them?
13         MS. DAINOW:  Objection.
14         You can answer.
15     A   I would not know.
16     Q   In what way, in what manner would
17 a principal who does want to communicate
18 information to students regarding the reporting
19 of sexual assaults against them convey that
20 information:  At an assembly, through
21 dissemination of written materials, something
22 else?
23     A   Possibly all those things.  Each
24 principal handles their own way.

80

20  (Pages 77 to 80)

T. Europe

1    T. Europe
2    Q   So there was no uniform DOE policy
3    concerning informing students as to how to
4    report sexual assaults against them in
5    1998-2002?
6         MS. DAINOW:  Objection.
7         You can answer.
8    A   I would not know if there was a
9    uniform policy.
10    Q   Was there any written policy by
11    the DOE concerning that?
12        MS. DAINOW:  Objection.
13        You can answer.
14    A   Not that I'm aware of.  Well, hold
15    on a second.  So within Chancellor's Regulation
16    A831, there is a discussion of the
17    administrators duty with the students.
18    Q   Does that specifically entail
19    informing students how they can report sexual
20    assaults against them?
21    A   I would have to familiarize myself
22    with that regulation again to give you a
23    definitive answer.
24    Q   But as you sit here you're not
25    sure?

81

1    T. Europe
2    A   Correct.
3    Q   Would you advise a New York City
4    Department of Education student who had a
5    teacher who tried to have sex with them but
6    fail to report that incident?
7         MS. DAINOW:  Objection.
8         You can answer.
9    A   Yes, I would.
10    Q   Would you consider a New York City
11    Department of Education teacher attempting to
12    kiss a female student while they were alone in
13    his office and attempted sexual assault?
14        MS. DAINOW:  Objection.
15        I'm going to block this line of
16    questioning.  You're going into claims
17    that have been dismissed.  This is not
18    part of what Judge Levy --
19        MR. ASHANTI:  Actual sexual
20    assault.
21        MS. DAINOW:  You did not say it.
22        MR. ASHANTI:  Read back the
23    question.
24        (Record read.)
25        MS. DAINOW:  So you described

82

1    T. Europe
2    sexual harassment and attempted sexual
3    assault.  All of those claims have been
4    dismissed from this action.  I'm
5    instructing the witness not to answer
6    this question.
7         MR. ASHANTI:  We have to call the
8    judge.
9         MS. DAINOW:  In an effort to move
10    this along, I am going to pay close
11    attention to follow-up questions.  But
12    note my objection.  Go ahead, you can
13    answer the question.
14    Q   Do you need to have it read back,
15    ma'am?
16    A   Yes, I do.
17        MR. ASHANTI:  Please, Karen.
18        (Record read.)
19        MS. DAINOW:  Objection.
20        You can answer.
21    A   Yes, I would consider that sexual
22    misconduct.
23    Q   Would you then advise that student
24    in that situation to report that incident?
25    A   Yes, I would.

83

1    T. Europe
2    Q   Between the years of 1998-2002,
3    what measures or policies did the DOE have in
4    place concerning the reporting of an incident
5    like that?
6         MS. DAINOW:  Objection.
7         You can answer.
8    A   Are you asking reporting on the
9    student?
10    Q   Reporting by the student?
11    A   Reporting by the student.  You're
12    asking if she's required to report?
13    Q   No, meaning how to report.  Is it
14    just your prior testimony that principals,
15    they're the captain of their own ship, and then
16    they would advise students how they see fit
17    concerning something like that or something
18    else?
19    A   No, they would advise to report
20    and then anybody that they report to is
21    required to report to the Special Commissioners
22    Office.
23    Q   But is it my understanding then in
24    terms of, again, it might relate to what you
25    said before.  But in terms of an incident like

84

21  (Pages 81 to 84)

T. Europe

1  I described, a female student being alone in an
2  office with a teacher and the teacher trying to
3  kiss her, is information for the students about
4  reporting something that just would have been
5  handled by the principal or was there a DOE
6  policy regarding that?
7          MS. DAINOW:  Objection.
8          You can answer.
9      A   So there's a Student, kind of,
10  Bill of Rights, I believe that it's called,
11  that's handed out to students.  But I'm not
12  familiar with the document to be honest.
13     Q   So you believe it may contain
14  something regarding reporting of attempted or
15  completed sexual assaults against them?
16         MS. DAINOW:  Objection.
17         You can answer.
18     A   I would be speculating, but I
19  would assume that there is something in the
20  Students Bill of Rights that would address
21  that.  But again that is pure speculation on my
22  part.
23     Q   When did the DOE first issue a
24  Students Bill of Rights?

85

T. Europe

1      A   I would not know.
2      Q   Was the Students Bill of Rights in
3  place between the years of 1998-2002?
4          MS. DAINOW:  Objection.
5          You can answer.
6      A   I do not know.
7      Q   During the years 1998-2002, would
8  it have been a violation of DOE policy for a
9  teacher to remove a female student from her
10  classroom without prior permission and to take
11  her off school grounds?
12         MS. DAINOW:  Objection.
13         You can answer.
14     A   I would need to hear more of the
15  circumstances behind that.
16     Q   Okay, I'll give you more.
17     A   Okay.
18     Q   So a female student is in a
19  classroom and her teacher is teaching her and
20  the rest of her classmates, and another teacher
21  with no connection to that class, is not an
22  assistant or anything like that, speaks to the
23  female student's teacher and tells that teacher
24  that he needs to take the female student out of

86

T. Europe

1  the class and does so.  And then subsequently
2  takes her off school grounds to a New York City
3  park for noneducational related purposes.
4  Would that be considered a violation of New
5  York City Department of Education policy?
6          MS. DAINOW:  Objection.
7          You can answer.
8      A   Well, I don't know if there's a
9  policy.  I assume we're talking about a high
10  school student?
11     Q   High school student.
12     A   Okay, I don't know if there's a
13  policy concerning that.  But would I deem it
14  inappropriate, yes.
15     Q   Would you consider that
16  inappropriate currently and for the years of
17  1998-2002?
18         MS. DAINOW:  Objection.
19         You can answer.
20     A   Depending on the reasoning, how
21  old the student is, I would have to look at it
22  case-by-case.  Does the child, you know, does
23  she have class after this?  Is it a
24  guidance-related thing?

87

T. Europe

1      Q   But let's say in the hypothetical
2  the student had no idea that the teacher was
3  going to come and remove her from the class and
4  it was just part of the school day and then
5  removed her from the class and took her off
6  school grounds and it was the teacher's
7  initiative, not the student's initiative.  The
8  student was going on with the what teacher was
9  instructing her, would you have considered that
10  inappropriate for the years 1998-2002?
11         MS. DAINOW:  Objection.
12         You can answer.
13     A   Are you alleging any force in this
14  or just, "Student, let's go, let's have a
15  talk," is that what we're talking about?
16     Q   Without any prior permission the
17  teacher decides for noneducational related
18  purposes, noneducational related purposes, to
19  take the student out of the class and off
20  school grounds without speaking to the
21  principal, without obtaining prior permission
22  from anyone, would you consider that
23  inappropriate?
24         MS. DAINOW:  Objection.

88

T. Europe

1      You can answer.
2      A   I would say probably with a
3  caveat.  You keep saying noneducational
4  purposes.
5      Q   Right.
6      A   We do have teachers that are very
7  engaged with their students.  If a student is
8  having some sort of emotional problem, some
9  sort of issues at home, is it possible -- and a
10 high school.  I'm not talking about middle or
11 elementary school.  But a high school student
12 where he or she is in some sort of distress of
13 some type and I'm trying to assist you, guide
14 you, kind of thing, I would say do it after
15 school hours.  However, I would have to know
16 what the intent of the person removing this
17 student.  And again, it's very different high
18 school versus middle school or elementary
19 school.  Because a high school student can
20 certainly say, "No, Miss Doe, I'm in class now,
21 let's talk later."  You know, high school 15,
22 16, 17, 18, I don't know what age you're
23 talking about.  But depending on the
24 circumstances it could be appropriate or it

89

T. Europe

1  could be inappropriate.
2      Q   It could be appropriate for a
3  teacher without prior permission, let's say,
4  the teacher is the same teacher who sought --
5  who tried to kiss this student when they were
6  alone in his office.  For that --
7      A   Different scenario inappropriate.
8      Q   Is it then your contention in that
9  circumstance where a teacher is seeking to
10 remove a student without any prior knowledge,
11 or permission from the student, or any
12 principal or anyone else because that student
13 isn't forcibly removed, that the student should
14 not follow the teacher's direction?
15     MS. DAINOW:  Objection.
16     You can answer.
17     A   That's not what I said.
18     Q   Well, I'm asking you.
19     A   Are we still -- which example are
20 we on now?  Are we on example of --
21     Q   A teacher.
22     A   I'm talking.  We established the
23 rules.
24     Q   I'm trying to finish my question.

90

T. Europe

1      A   Relax.
2      Q   You should relax.  You asked me a
3  question.
4      A   I'm quite relax actually.
5      Q   So am I.  I'm answering your
6  question.
7      A   You're a little aggressive.
8      Q   I'm not aggressive.  I'm asking
9  you a question.
10     A   I'm just going to say what I was
11 attempting to say.  We can do this all day.  I
12 got all day.
13     Q   Continue.
14     A   I'm asking you is it the scenario
15 where you said it was the teacher who tried to
16 kiss the student removing her from class?  If
17 that's the question, I agree 100 percent that
18 is inappropriate.  Or are we talking about a
19 situation where this particular student is in
20 some sort of distress and somebody is trying to
21 guide her an assist her?  Which is it?  In
22 which scenario?
23     Q   Let's say this hypothetical.  It
24 is the student -- the teacher who tried to kiss

91

T. Europe

1  this student but is seeking to remove the
2  student from the class under the guise toward
3  the student of seeking to help her with
4  emotional distress.  So both.  The answer to
5  your question is both.  So that's the
6  hypothetical that we're discussing, all right.
7      So my question regarding that
8  particular hypothetical factual scenario is do
9  you believe that it would be -- it's the burden
10 of a student in that scenario to then refuse to
11 follow the teacher's direction of being removed
12 from the classroom and taken off school
13 grounds?
14     MS. DAINOW:  First, note my
15 objection.
16     Over my objection the witness can
17 answer.  But I'd also like to put on the
18 record at no point in the colloquy
19 between Mr. Ashanti and the witness did
20 the witness in any point raise her
21 voice.  She did not and she did not
22 yell.
23     But go ahead.
24     MR. ASHANTI:  That's your

92

23 (Pages 89 to 92)

T. Europe

1  interpretation.
2  Read back the last read back.
3  A  I don't need it read back.
4  What you said is the same
5  gentleman that attempted to kiss her is the
6  same person removing her from the class?
7  Q  Correct.
8  A  I believe that is inappropriate.
9  Q  But my follow-up question is
10 because you had mentioned earlier -- I know
11 there was a different hypothetical scenario.
12 I'm not holding you to that, right. But I'm
13 just referring to that what you said before.
14 Is that if it's a high school student, high
15 school's different than middle school, than
16 elementary school, 15, 16, 17, 18 years old,
17 that they have some agency and then should say,
18 "No, no, I'm not going with you." But in the
19 hypothetical that I presented where it is the
20 teacher who tried to kiss the student when they
21 were alone in his office and is using the guise
22 of seeking to give a student emotional support,
23 is it the burden of a student in that scenario
24 to refuse the direction of the teacher to take

93

T. Europe

1  her out of her class and off school grounds?
2  MS. DAINOW: Objection.
3  You can answer.
4  A  So you're mischaracterizing what I
5  said. So let me clarify.
6  I never said that the student
7  should say. I said the student could depending
8  on the age. I don't believe it's ever the
9  burden of the student to push back on the
10 teacher. Not the burden. It's the teacher who
11 is the adult and the one in the position of
12 power. So, no, I'm not saying the student
13 should say, "I don't want to go with you." All
14 I said was the student could say depending on
15 the student themselves. Again, I don't think
16 we're in any disagreement here. I believe that
17 scenario where a teacher attempts to kiss a
18 student and then later comes to collect that
19 student to under the guise of giving her any
20 assistance, I believe that is inappropriate,
21 yes.
22 Q  During your time, your 25-year
23 plus career with the New York City Department
24 of Education, have you ever personally received

94

T. Europe

1  training on the New York City Human Rights Law?
2  A  I'm going to say possibly I've
3  received. I've gone to a lot of trainings
4  through the years on a number of topics. I
5  can't say whether yes or no specifically
6  concerning the Human Rights Law. That wasn't
7  under my wheelhouse concerning my position as
8  Director of the Administrative Trials Unit.
9  Q  Are you aware of any policy or
10 measures in place for the New York City
11 Department of Education that mandate that any
12 New York City Department of Education employee
13 receive Human Rights Law training either under
14 state law or city law?
15 A  Actually, now you say that, yeah,
16 we do receive human rights trainings.
17 Q  Human Rights Law trainings?
18 A  Trainings. We get -- I don't know
19 it was back in 2002 when you're talking about
20 it. But we do receive online training
21 currently.
22 MS. DAINOW: Karl, can we take a
23 two-minute break?
24 MR. ASHANTI: Sure.

95

T. Europe

1  MS. DAINOW: Thanks.
2  (Whereupon, a brief recess was
3  taken.)
4  Q  So training on Human Rights Laws,
5  when did you receive that?
6  A  I really couldn't say. We get --
7  it might not have been specifically the Human
8  Rights Law. We get specific training
9  concerning sexual harassment.
10 Q  Sexual assault?
11 A  No, not sexual assault. It
12 specifically actually under-- comes through
13 the Office of Equal Opportunity.
14 Q  So you believe that it didn't
15 necessarily concern the New York City Human
16 Rights Law, New York State Human Rights Law; is
17 that fair?
18 A  That's fair.
19 Q  You're referring to then EEOC
20 training?
21 A  Yes.
22 Q  And within the EEOC training that
23 you've received, was there any discussion about
24 reporting of sexual misconduct against

96

T. Europe

1  students?
2
3      A    From adults perspective or
4  students perspective?
5      Q    Either.
6      A    Yeah, there's a duty to report
7  from the adult that becomes aware of a sexual
8  assault.
9          MS. DAINOW:  Just note my
10         objection to the last question.
11     Q    I'm saying, though, was that part
12 of EEOC training that you were referring to
13 before?
14     A    I don't really recall to be
15 perfectly honest.  It may or may not have been
16 in there.
17     Q    During the years 1998-2002 was
18 there an individual or office within New York
19 City Department of Education that was
20 responsible for coordinating training regarding
21 sexual assault either the reporting or
22 deterring it?
23         MS. DAINOW:  Objection.
24         You can answer.
25     A    So my office at the time I was

97

T. Europe

1  Director of Administrative Trials Unit, I would
2  do trainings at principals' conferences.  So
3  superintendent would gather their principals.
4  Either myself or my deputy at the time would go
5  out and do training.  Sexual assault was a
6  piece of that training.  And again we're using
7  legal terms "sexual assaults."  I'm going to
8  use "sexual misconduct" because it has a wider
9  definition.  As part of our training we would
10 address that.
11     Q    During those years 1998-2002, did
12 you offer such training or give such training
13 to employees of the Francis Lewis High School?
14     A    The only people I would be doing
15 the training with would be principals or
16 assistant principals.  And I don't recall
17 whether Frances Lewis was at the training or
18 not.  I would go district by district.
19     Q    Do you know which district houses
20 Francis Lewis High School?
21     A    Not offhand.  I just know it's a
22 school in Queens.
23     Q    Was it mandatory for the
24 principals to attend the training that you

98

T. Europe

1  offered during those years?
2
3      A    So it would be mandatory for them
4  to come to their Superintendent's conference.
5  The superintendent is calling a conference of
6  their principals.  A superintendent would
7  invite myself or one of my staff members to
8  come in and do the training.
9          MS. DAINOW:  Note my objection to
10         the last question.
11         Go ahead, Karl.
12     Q    What was your title at the time?
13     A    Director of Administrative Trials
14 Unit.
15     Q    Are you aware of any other office
16 within the DOE that conducted those similar
17 trainings that you're referring to during the
18 years of 1998-2002?
19         MS. DAINOW:  Objection.
20         You can answer.
21     A    The Office of Special
22 Investigations would conduct trainings as well.
23     Q    The trainings that they would
24 conduct, who would attend those?
25         MS. DAINOW:  Objection.

99

T. Europe

1  You can answer.
2
3      A    Same audience.
4      Q    Principals?
5      A    Correct.
6      Q    Was it mandatory for principals to
7  attend those training by SCI?
8          MS. DAINOW:  Objection.
9          But you can answer over my
10         objection.
11     A    I didn't say SCI.  I said Office
12 of Special Investigations which is our internal
13 investigative branch on behalf of the
14 Chancellor's.  So there's OSI, Office of
15 Special Investigations.  And then there's SCI,
16 the Special Commissioner of Investigations.
17 The Special Commissioner, SCI is an external
18 investigatory body.
19     Q    So OSI was mandatory for
20 principals to attend the OSI training for those
21 years?
22         MS. DAINOW:  Objection.
23         You can answer.
24     A    Same answer.  The superintendents
25 would gather their staff, meaning their

100

25 (Pages 97 to 100)

T. Europe

1  principals. Sometimes their assistant
2  principals. And then they would invite us, the
3  trainers to come to their conferences. They
4  would have an all day conference and we would
5  just be one of many speakers.
6      Q   So the trainers you're referring
7  to, that would include trainers from OSI?
8      A   Yes. Again different offices,
9  different training.
10     Q   Are you familiar with the
11  trainings that they offered OSI?
12     A   They would do more about recording
13 requirements.
14     Q   During those conferences would
15 there be any materials that would be
16 disseminated by either you or OSI or any other
17 trainers?
18         MS. DAINOW: Objection.
19         You can answer.
20     A   I don't recall back then. I may
21 have given out my PowerPoint, something to that
22 effect.
23     Q   Do you retain any of that
24 material, like your PowerPoints or any

101

T. Europe

1  materials from that period of time?
2      A   I don't have that from that period
3  of time, no.
4      Q   Are any of those kinds of
5  materials housed within any department of New
6  York City Department of Education?
7      A   I would say no. It was literally
8  just I would make a PowerPoint. I would change
9  it as the years went on depending on the
10 audience that I was presenting to or adding
11 more material, withdrawing material. It was
12 always a work in progress.
13     Q   Did you ever personally or anyone
14 from the office you had during those years
15 train students regarding reporting?
16     A   No.
17     Q   Just from what your understanding
18 and your experience. Were there any other
19 trainers who gave similar training for the
20 years 1998-2002 regarding either reporting or
21 deterring of sexual misconduct besides OSI and
22 your office?
23         MS. DAINOW: Objection.
24         You can answer.

102

T. Europe

1      A   I don't know if it was back then,
2  but I know OEO also does trainings on a regular
3  basis.
4      Q   Ms. Europe, in terms of the
5  reporting that -- one teacher is aware of
6  sexual misconduct against a student by another
7  teacher for the years of 1998-2002, what is
8  your understanding of how that teacher who has
9  that knowledge should have reported back then
10 the incident of sexual misconduct?
11         MS. DAINOW: Objection.
12         You can answer.
13     A   That teacher had a requirement to
14 report that allegation to the Office of the
15 Special Commissioner.
16     Q   So not Special Commissioner of
17 Investigation, the Office of Special
18 Commission?
19     A   No, no. We're talking about the
20 same office, SCI.
21     Q   And your answer concerns what that
22 teacher applies to the years 1998-2002; is that
23 correct?
24         MS. DAINOW: Objection.

103

T. Europe

1          You can answer.
2      A   That's correct.
3      Q   That reporting would have been
4  mandated, correct?
5          MS. DAINOW: Objection.
6          You can answer.
7      A   Correct.
8      Q   Mandated according to Executive
9  Order No. 11?
10     A   Correct.
11     Q   Mandated according to Chancellor's
12 Regulation A831?
13     A   Correct.
14     Q   Any other regulation or policy
15 would have been mandated under to your
16 knowledge?
17     A   No, those are reporting
18 requirements.
19         MR. ASHANTI: I may not have
20 mentioned this before. If I am
21 repeating myself, I apologize. I'm
22 calling again for the production of
23 Chancellor's regulation A831 and I
24 reiterate any prior requests that I made

104

26 (Pages 101 to 104)

T. Europe

1                  T. Europe
2    for discovery.
3         MS. DAINOW:  Just put your
4    requesting in writing, Counselor.
5         Q    During the course of this
6    deposition, are there any questions you'd like
7    to either supplement or revise -- any answers
8    to any questions that you would like to either
9    supplement or revise?
10         A    I just want to reiterate
11    concerning the Students Bill of Rights.  I have
12    not looked at it in, I don't know, how many
13    years.  But I do believe under the Students
14    Bill of Rights, and you'll have to forgive me
15    because, like I said, it's been many years
16    since I've looked at it.  But I believe there
17    is a requirement in there for a student to
18    report anything concerning the -- that could
19    jeopardize the health and well-being of a
20    student or the school community.
21         Q    Meaning of another student or
22    school community?
23         A    Correct.
24         Q    But as you sit here right now
25    today, you are not sure of when that Students

105

1                  T. Europe
2    Bill of Rights was first issued; is that fair?
3         A    That's right fair, yes.
4         MR. ASHANTI:  No further
5    questions.
6         MS. DAINOW:  I don't have any
7    questions.  Thank you very much for your
8    time today.
9         (Time note: 1:06 p.m.)

106

ACKNOWLEDGEMENT

STATE OF NEW YORK)
            : ss
COUNTY OF     )

      I, THERESA EUROPE, hereby certify
that I have read the transcript of my testimony
taken under oath in my deposition of September
13, 2023; that the transcript is a true,
complete and correct record of my testimony;
and that the answers on the record as given by
me are true and correct.

_____
         THERESA EUROPE

Signed and subscribed to
before me, this _____ day
of _____, 2023.

_____
Notary Public, State of New York

107

I N D E X

WITNESS                  PAGE
THERESA EUROPE
   EXAMINATION BY:
   MR. ASHANTI              7

E X H I B I T S
PLAINTIFF'S    DESCRIPTION        PAGE
Exhibit 1     Executive Order No. 11    6
Exhibit 2     Redacted letter dated    6
            5/13/02        ^

DOCUMENTS AND/OR INFORMATION REQUESTED
DESCRIPTION                PAGE
Annual reports of NYC DOE issued by     41
Deputy Commissioner of Investigations
from 1998-2002
Investigative reports issued by Deputy     41
Commissioner of Investigations from
1998-2002 store by Office of General
Counsel

Chancellor's Regulation A8131        104

108

27 (Pages 105 to 108)

```
 1
 2            C E R T I F I C A T E
 3
 4    STATE OF NEW YORK   )
                          ) ss:
 5    COUNTY OF BRONX    )
 6
 7        I, KAREN VIGGIANO, a Shorthand
 8    Reporter and Notary Public within and for
 9    the State of New York, do hereby certify:
10        That THERESA EUROPE, the witness whose
11    examination is hereinbefore set forth, was duly
12    sworn by me and that this transcript of such
13    examination is a true record of the testimony
14    given by such witness.
15        I further certify that I am not related
16    to any of the parties to this action by blood
17    or marriage and that I am in no way interested
18    in the outcome of this matter.
19
20    IN WITNESS WHEREOF, I have hereunto set my hand
21    this 25th day of September, 2023.
22
23            Karen S. Viggiano
24    _____
              KAREN VIGGIANO
25
                                        109
```